[Crim. No. 12033.   Second Dist., Div. Three.   Mar. 31, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. EDWARD
PETER TURNER, JR., Defendant and Appellant.

910

Edward Peter Turner, in pro. per., and Raymond H. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ronald M. George, Deputy Attorney General, for Plaintiff and Respondent.

FRAMPTON, J. pro tem.*—Appeal from judgment of conviction of grand theft in one count and of forgery in three counts.

Defendant was charged by information filed by the District Attorney of Los Angeles County, in count I thereof, with the crime of grand theft, a felony, in violation of section 487, subdivision 1 of the Penal Code, and with the crime of forgery, a felony, in violation of section 470 of the Penal Code in counts II, III and IV thereof.

On August 6, 1965, the defendant's motion under section 995 of the Penal Code was denied; he was duly rearraigned upon the information and entered his plea of not guilty. At this time the defendant moved the court to permit him to proceed in propria persona and at the same time retain his counsel in an advisory capacity. This motion was denied. Defendant waived the time for trial and the cause was set for trial, after two continuances, on September 1, 1965. On September 1, 1965, upon motion of the defendant, his counsel was relieved as attorney of record and the defendant was permitted to proceed with the trial in propria persona. The trial proceeded before a jury and at the conclusion thereof the jury returned its verdicts finding the defendant guilty on all counts as charged. Motion for a new trial was denied, probation was denied and defendant was sentenced to state prison for the term prescribed by law on each of the four counts; the sentence on each count was ordered to run concurrently with the sentences on the others. The appeal is from the judgment of conviction.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

## *The Testimony Taken in The Presence of the Jury*

Mr. Stanley Jones, an appliance salesman for the May Company store situated at Wilshire Boulevard and Fairfax Avenue in the City of Los Angeles, received a telephone call at the store on April 27, 1965, from a man who identified himself as James Vincent Palmer. The man asked whether it was possible to place an order over the telephone for a Magnavox color television set and a "stereo" and to have them delivered. Jones replied, " 'Yes, if you have an account with the May Company, it may be arranged.' " The man told Jones, " 'Fine. I do have an account and here is my number of the account.' " The man then gave Jones the number 48-4166-6565 and said, " 'My name is James Vincent Palmer. My address is 1564 South Beverly Drive, Los Angeles 35. My telephone number is CR, Crestview 1-0320.' " The man specified the number of the color television set and inquired whether the matching Magnavox "stereo" was in stock. Jones told the man that he would check the inventory and, after doing so, he told the man that the items were in stock. Jones asked, " 'The one at six forty-five?' " The man replied, " 'Yes, that is right. How much is the stereo?' " Jones replied that the latter item was selling at $695. The man asked when the items could be delivered and Jones replied that if the items were "cleared" by the credit department the "stereo" could be delivered on April 30, 1965, and the color television set on May 1, 1965.

Jones then telephoned the credit department at the downtown store and the Retail Credit Association to ascertain whether there was a person by the name of James Vincent Palmer with the account number which had been given. He then wrote up a "proposal for purchase to be cleared by the Credit Department" and took it to the time payment office of the Wilshire store. The following morning Jones called the credit department and was given the authorization number "X-40," which meant that there was an "applicable account." Jones then prepared a sales slip for the two items. He wrote upon the sales slip " 'Send to James Vincent Palmer, 1564 South Beverly Drive, L.A. 35' "; the account number 48-4166-6565; the total price for the Magnavox color television set, "$670.80"; the delivery date "4-30"; the purchaser's telephone number "Crestview 1-0320"; his "sales person" number "93"; the date the sale was written up "4-28-65," and the abbreviation "Flex" indicating a

flexible account which could be paid in monthly installments. A similar procedure was followed by Jones in recording the sale of the "stereo." The sales slip consisted of an original and four copies. It was Jones' practice to take the original sales slip to the cash register, ring up the sale, and then dispatch the original "audit envelope" to the credit department on the evening of the date of the sale. Copies of the sales slips were always taken by Jones to the cashier's office and were there audited gainst the sales tickets to make sure that all of the sales were "rung up" on the cash register. Jones kept copies of the sales slips for his own records, and other copies were sent to the store's warehouse. A delivery, installation and warranty contract for the television set was prepared by Jones and was also sent to the warehouse for delivery with the merchandise. Jones later assumed that the merchandise had been delivered, since he worked on a commission basis and he received a commission on this sale. He had never met the defendant at the May Company store or elsewhere.

The witness Robert Heller testified that he was employed by Dealers Installation Service and delivered appliances for the May Company to its customers. When he made deliveries it was his practice to give the person receiving the merchandise three yellow copies of the sales receipt and to have such person sign the delivery copy of the receipt. The latter copy was always turned in to the office of Heller's employer at the end of the day. On April 30, 1965, he delivered for May Company a pecan-colored, model 1541, Magnavox color television set and a Magnavox "stereo" to 1564 South Beverly Drive, apartment number 9. A blonde woman, who appeared to be 28 years of age and somewhat heavy set, received the merchandise and signed the delivery slips with the name "Mrs. J. V. Palmer." Heller did not observe anyone else at the apartment during the period of approximately one and one-half hours that it took him and his helper, George Richard, to install and test the television set.

Mr. James Vincent Palmer testified in substance that he and his wife had continuously resided at 315 Waverly Drive in the City of Pasadena for the period of five and one-half years next preceding the date of trial and that they, nor either of them had ever occupied the premises at 1564 South Beverly Drive in the City of Los Angeles. He testified further that he had not signed, nor had he authorized anyone to sign for him, the two applications for credit with the May Company, shown to him, nor had he authorized or instructed

anyone to prepare a charge card notice of change of address form changing his address as listed with the May Company from 315 Waverly Drive, Pasadena to 1564 South Beverly Drive, Los Angeles. He had never worked at 5455 Wilshire Boulevard for the International Sales Corporation or had the telephone number WE 8-1971. The latter address and telephone were listed on one of the May Company applications for credit as Palmer's business address and telephone number. He had not purchased a Magnavox "stereo set" from the May Company in April of 1965.

Mrs. Rose Austin testified in substance that on February 19 or 20, 1965, she had rented apartment number 9, a two bedroom, unfurnished apartment, at 1564 South Beverly Drive in the City of Los Angeles to the defendant. He gave his name as James L. E. Palmer and stated that he had a business known as the International Sales Corporation located at 5455 Wilshire Boulevard. She did not know that his true name was Turner. The defendant moved into the apartment on about March 1, 1965, and resided there until the first part of May 1965. The name Palmer was placed on the mailbox. Mrs. Austin had never seen a blonde woman at the apartment. The defendant apparently had furnished the apartment as Mrs. Austin had observed furniture therein after the defendant had moved in. The defendant told her that his "sister," a Mrs. Sindon, was selecting the furniture for him.

George Wool testified that he was a driver employed by "United Parcel" but assigned to making deliveries to customers of the May Company from the latter's furniture warehouse. On March 25, 1965, he delivered three pieces of furniture and on April 1, 1965, he delivered eight pieces of furniture, all from the May Company furniture warehouse, to apartment number 9 at 1564 South Beverly Drive. On one occasion the manager of the apartment house let him into the apartment and on the other occasion a somewhat "hefty" woman with blonde hair received the merchandise.

On March 17, 1965, the defendant, accompanied by Mrs. Arlen Sindon, had purchased some furniture from the May Company Wilshire store through Mr. Jack Gilbert, the interior decorator for the store. Defendant and Mrs. Sindon had selected several items of furniture including a dining room table, four side chairs and two arm chairs. The total price of these items was $456.76. Gilbert prepared a sales slip. Mrs. Sindon presented a charge plate bearing the name of Arlen E. Sindon and signed her name to the sales slip in the

presence of the defendant. Defendant and Mrs. Sindon also purchased a cocktail table, a bedroom chest, a nightstand and a headboard for a total of $549.07. They also purchased a king size mattress and box spring, and a bed frame for a total of $331.71, and a sofa for the price of $300. Separate sales slips were made out for each of the foregoing four transactions, and Mrs. Sindon signed her name to the sales slips and used the charge plate bearing her name. Defendant and Mrs. Sindon ordered the merchandise to be sent to Arlen E. Sindon, 1564 South Beverly Drive, Los Angeles. Defendant did not identify himself to Mr. Gilbert by any name. Gilbert followed the same procedure, relating to the disposition of the original and various copies of the sales slips, as was followed by Mr. Jones.

Mrs. Anita Robins was the manager and the custodian of the records of the Charge Card Office, an organization owned by member department stores. May Company was a member of the organization. Her office prepared charge cards for the use of customers of its members. On April 3, 1965, she received instructions from the May Company to change the address of the James V. Palmer account from 315 Waverly Drive, Pasadena, to 1564 South Beverly Drive, Los Angeles. The form requesting the change of address was signed by a May Company employee by the name of Turner. On April 14, 1965, Mrs. Robins sent two new charge cards to the latter address. Only certain authorized personnel of the May Company are permitted to sign requests for change of address for customers' accounts. She recognized the signature of Turner on the request as being the name of one who was listed as an employee of the May Company who was authorized to sign such requests. The name of Turner was familiar to her as it had appeared on other forms.

Mr. Irving Gilbert, who held the title of credit manager of the May Company, testified that he had been in the employ of May Company for a little over seven and one-half years. During this time he had worked as credit manager, collection manager and as prelegal manager. Defendant worked in the collection department of May Company from about January 1, 1965, until the date of his arrest on the present charges (May 17, 1965). Both Gilbert and defendant worked in the main office of May Company situated in downtown Los Angeles. In the capacity in which he was employed, the defendant had access to the account files which would contain the James

V. Palmer account. These files housed the sales slips which were used to record the purchases made by individual customers. If an employee should remove a sales slip from a customers' account file, the employees in charge of billing would have no record of the sale involved and consequently the customer would not be charged for the sale. The May Company's office record of the James V. Palmer account at 1564 South Beverly Drive disclosed that the Magnavox color television set and the "stereo" had never been billed to that account. Gilbert had searched for the billing copies of the sales slips recording the purchase of this merchandise but was unable to find them. The records of the May Company also disclosed that none of the purchases which the defendant and Mrs. Sindon had made together were recorded or charged against the account of Arlen E. Sindon. Gilbert's search of the store's records disclosed that contrary to normal procedure, neither the auditing department nor the billing department had ever received a copy of the sales slips which had recorded these purchases. The maximum period of time between a sale and the filing of the sales slip in the customer's account is three days. In order for the account to be billed, it would be necessary for the billing department to have received a sales slip recording the purchase. The collection department did not become aware of these purchases until the yellow copies of the sales slips came to light. At no time during defendant's employment at the May Company did Mr. Gilbert know him under the name of James V. Palmer.

Mrs. Mary Joan Sindon, the wife of Arlen Earle Sindon, had known the defendant since September of 1964. She testified that she and the defendant "used to say that we were close enough that we could be called brother and sister, but we weren't blood relations." She testified in substance further that she and her husband had a charge account at May Company. Early in January of 1965 defendant talked to her in her home about the possibility of their purchasing merchandise on Mrs. Sindon's account and of defendant using his position at May Company to withdraw the sales slips from the billing department relating to such purchases so that the Sindons would not be billed therefor. Mrs. Sindon expressed doubt that this could be done successfully since she was familiar with department store operations, having once worked in the credit department of such a store. Defendant maintained that this could be done.

Shortly after this conversation, defendant came to the home of Mrs. Sindon with an original sales slip which recorded the purchase of an iron which she had made two weeks earlier at the Wilshire store of May Company, with the use of her charge card. She testified concerning this occasion that "He was joking. He said, 'See, it can be done.' And I said, 'Well, I can see that.' And so then he said, 'Well, now, you can go out and charge.' And I said, 'Well, okay.' " She never received a bill for the iron. Sometime prior to March 15, 1965, Mrs. Sindon purchased a bedroom set of furniture and some draperies from the downtown store of May Company, charging this purchase to her account. A few days earlier she had told the defendant that she was going shopping and that he should " 'keep an eye out on the account,' that these were coming in." She was never billed for this purchase.

Mrs. Sindon testified further that on March 6, 1965, she made certain purchases using a charge card under the name of Mrs. E. S. Stevens. She had received this card after the defendant had told her that he was going to fill out a new application for a card under this name, and that she could use it. Defendant told her that "I would purchase some things for him and some things for myself" on the Stevens account, and that such purchases "would be taken care of." She purchased four $25 gift certificates which she charged to this account, two of which she kept and two of which she gave to the defendant. She did not receive a bill for some of the items which she purchased and charged to this account. She destroyed the charge card on the Stevens account when defendant called her and told her that he had been arrested.

On March 17, 1965, according to the testimony of Mrs. Sindon, she and the defendant purchased from the Wilshire store of May Company, through Mr. Jack Gilbert, the furniture heretofore described in his testimony. Defendant had told her that he wanted to use her charge account to make the purchases and that the furniture would be delivered to his apartment at 1564 South Beverly Drive, but that she would not be billed for the merchandise. She had not liked the idea of using her charge card, but she had assented to the idea. She never received a bill for this merchandise. She subsequntly saw the merchandise in defendant's apartment at 1564 South Beverly Drive and defendant had informed her that the sales slips therefor had been pulled.

Mrs. Sindon testified that on March 30, 1965, she had purchased a portable television set at the May Company using a

charge card under the name of Mary Lynn Crocket. Her previous married name was Mary Joan Crocket. About one month prior to this purchase defendant had told her that he knew she had been previously married to a man named Crocket, that he had seen a file at May Company under the name of Mary Crocket and that he would have a charge card sent to her home. She received a card bearing the name Mary Lynn Crocket. The television set was delivered, but Mrs. Sindon never received a bill for it, the defendant having assured her that the purchase "would be okayed." Defendant occasionally borrowed the Mary Lynn Crocket charge card as well as the E. S. Stevens charge card. Mrs. Sindon destroyed the Crocket charge card on the day that she learned of the defendant's arrest. In about May of 1965, Mrs. Sindon told the defendant that she was going to purchase a color television set and suggested that perhaps he might be able to take care of the bill. Defendant told her " 'I will try and take care of it,' " but she was billed for this purchase shortly after defendant's arrest. Defendant had once told Mrs. Sindon "that he had pulled a file and mixed it up—had taken it to his desk and had mixed it up with other files so they couldn't see he had pulled a file that he wasn't assigned to and that way he could shuffle them around."[1]

### The Testimony as to Probable Cause and Search and Seizure

The following testimony was elicited outside the presence of the jury: James R. Ferguson, a police officer for the City of Los Angeles, assigned for the past 19 years to the fraud division, testified that he participated in the arrest of the defendant at apartment 9, 1564 South Beverly Drive, on May 17, 1965. Two days earlier he had been contacted by telephone by Irwin Fisk, a special agent for Stores Protective Association of Los Angeles. Fisk was in charge of the association's retail credit fraud investigation and was assigned to investigate this case involving the May Company. Fisk told Ferguson that there was a possible fraud charge which appeared to involve one of the May Company's employees named Edward Turner. Fisk related that a man and woman had been trying to purchase on the Palmer account in the West Los Angeles store and that when they went to check the credit, the man and woman had left and upon checking further it was found that

---

[1] The witness Mary Joan Sindon was granted immunity from prosecution for testifying on behalf of the state.

the application upon which the account was based was the type of application for internal use only. That in talking to the salesgirl who handled the attempted purchase, she gave a description of the man involved which matched the description of Turner.

Fisk requested that the police join in the investigation, but Officer Ferguson said that there was not enough to go out on at that time. Ferguson suggested that Fisk contact the real Mr. Palmer and this was done. Palmer stated that he had not purchased merchandise at the West Los Angeles store of May Company and that he had not given anyone permission to use his account. He had not moved nor had he asked for a change of address on his account.

Fisk knew that the May Company felt that the original sales slips involved in the purchases had been destroyed. He knew that there were shortages totaling approximately $8,000 in the May Company's P to S accounts, and it was suspected that the defendant was responsible. A member of May Company's credit department had observed a color television set in defendant's apartment at 1564 South Beverly Drive.

These matters were related to Officer Ferguson two days after his initial conversation with Fisk. Ferguson also was told that there were two James V. Palmer applications on file and that the real Palmer had not filled out the second application and that the latter application had possibly been filled out by the defendant. Fisk also told Ferguson that the shortage in the James V. Palmer account was probably caused by the destruction of sales slips prior to billing and that everything pointed to Mr. Turner at that time. A television set and a ''stereo'' costing a total of $1,500 were among the items purchased on the Palmer account at 1564 South Beverly Drive.

Officer Ferguson inspected the credit application involved as well as the defendant's application for employment and his personnel folder. He compared the defendant's handwriting found in his personnel file with the handwriting found on the questioned application. He also checked the police record bureau and there found the record of a person bearing the defendant's name with vital statistics contained therein which matched the defendant's description. This record was compiled as the result of an arrest for forgery. Officer Ferguson also talked to two employees of the May Company who gave him the description of a man who, two days earlier, had used a James V. Palmer charge card. The description of this man, as given to Officer Ferguson, matched the description of

the defendant. Officer Ferguson was told by the employees that when this man and a woman who had accompanied him were referred to the credit office they left the store hurriedly without completing the purchase of the merchandise.

On May 17, 1965, Officer Ferguson, with the two employees who had stated that they could identify the customer who had attempted to use the Palmer charge card, proceeded to 1564 South Beverly Drive. Officer Ferguson's initial plan had been to have these employees observe the defendant at the store but the defendant unexpectedly had not reported for work. This led Officer Ferguson to believe that the defendant might have fled. Defendant was not at the apartment when Officer Ferguson arrived. Officer Ferguson checked and found that apartment number 9 at 1564 South Beverly Drive and the telephone at that address were both listed under the name of Palmer. A "mug shot" of the defendant was identified by the employees of the West Los Angeles store as that of the man who attempted to use the Palmer account.

A "stake out" was established near the Beverly Drive apartment. At approximately 4:15 p.m. on May 17, 1965, a man drove up and parked his car near the apartment building. One of the May Company employees (a Mr. Siverson) identified the man as the defendant. Defendant walked to apartment 9 and Officer Ferguson followed him. As the defendant opened the door and started to enter the apartment, Officer Ferguson asked him if he was Mr. Palmer and defendant replied that he was. Defendant entered the apartment at which time Officer Ferguson stated, "Police officers. May we come in?" Defendant replied, "Yes, certainly, come on in." Officer Ferguson then asked defendant if his name was James V. Palmer and defendant stated that his name was James Palmer. Officer Ferguson entered the apartment followed by Fisk, a fellow officer named Schott, and Siverson. At this juncture Siverson, the May Company employee who knew the defendant as Turner, said, "Hello Ed." Officer Ferguson then asked Siverson, "Is this the man you know as Ed Turner?" Siverson responded in the affirmative.

At this juncture Officer Ferguson informed the defendant that he was under arrest for grand theft. He advised defendant "that he might remain silent, that he was entitled to the service of an attorney, and anything he said or did could be used against him in court." Defendant asked Officer Ferguson what it was all about and the latter informed defendant that the illegal use of the Palmer account was involved. De-

fendant stated, "It is only an overload. Do you know what an overload is?" And Officer Ferguson replied that he did. Officer Ferguson then showed the two applications under the name of Palmer to the defendant and asked him whether he had filled them out, and the defendant replied that he had done so, that he worked for the May Company, the information which he had given on the Palmer application forms was false, he was an epileptic, and that it was only a matter of time until the May Company would learn that he was an epileptic and would discharge him and that he had planned to assume a new identity under the name of Palmer. When asked if he had filled out the change of address form under the name James V. Palmer, a Pasadena account, defendant stated that he had done so after he had failed to receive, as expected, a charge card under the name James V. Palmer, and "that he selected the particular account because it was a good and seldom-used account, he put through the change of address and thereafter the charg-a-plate arrived." When asked whether the Magnovox color television set and the "stereo" in his apartment were the ones that had been obtained on the Palmer account, defendant replied that "he came home one day and they were there. He was living with a girl by the name of Carolyn Fike and she must have ordered them."

At this point Sergeant Schott, Fisk and Siverson began a search of the apartment. Inside a large cardboard carton found in the middle of the bedroom floor Fisk found the two sales slips which recorded the sale of the color television and the "stereo" to James Palmer. Fisk brought the two sales slips to Officer Ferguson who then questioned defendant about the documents. Fisk then searched further in the carton and found the following untorn documents: the four sales slips recording the purchase by defendant and Mrs. Sindon of the furniture from May Company through the salesman Jack Gilbert; a sales slip recording some purchases made by Mrs. Sindon on March 30, 1965, on the Mary Lynn Crocket account. Fisk gave these documents to Officer Ferguson. The following documents which were torn into pieces[2] were also found in the carton and were delivered by Fisk to Officer Ferguson: two May Company application cards filled out by the real James Palmer; a ledger sheet pertaining to the James Palmer account; an account card of the real Mrs. James V. Palmer;

[2]With Officer Ferguson's approval, Fisk assembled the pieces of the torn documents and fastened them together with scotch-tape prior to the documents being introduced in evidence at the trial.

an audit copy of a sales slip recording Mrs. Sindon's purchase of the portable television set on March 30, 1965, on the Mary Lynn Crocket account, and a sales slip recording Mrs. Sindon's purchase of the four $25 gift certificates on March 6, 1965, on the Mrs. E. S. Stevens account. Officers Ferguson and Schott were present at all times in the defendant's apartment and were in and out of the bedroom frequently during the time that Fisk searched in the carton and found the foregoing described accounting records of the May Company.

The statements of the defendant were freely and voluntarily made.

Defendant elicited further testimony on the issue of probable cause for his arrest and the right of the police officers to search or permit the search of his apartment. Approximately 5 days of the court's time was taken and 408 pages of the reporter's transcript was devoted to the above hearing. At the conclusion of the hearing the trial court ruled that there was probable cause for the defendant's arrest; the search of defendant's residence was incidental to his arrest; defendant was advised of his constitutional rights at the time of his arrest, and that his statements to the police were freely and voluntarily made. The trial was then resumed in the presence of the jury.

### The Testimony Taken in the Presence of the Jury Continued

Evidence of the circumstances surrounding the defendant's arrest, substantially as it was related on the hearing to show probable cause, was received. Officer Ferguson again asked defendant about the furniture found in his apartment and defendant stated that his sister had purchased it for him, and that his sister's name was Mary Sindon. When asked whether the sales slips found in the apartment were related to the television and "stereo" found therein the defendant replied that they were. Officer Ferguson then told the defendant that the original sales slips found in the apartment had never appeared in the May Company credit office for billing, even though the sales had been approved for credit, and that a number of documents had disappeared during the period in which the defendant was employed by the May Company. Defendant responded that he knew nothing about this. Defendant was asked whether certain items of furniture in the living room, dining room, and bedroom were those enumerated on the other documents (involving charges on the Sindon account) found in the bedroom, and he replied that they were.

Defendant then stated that Mrs. Sindon was really not his sister, that they had assumed a more or less sister and brother relationship and had called each other by those names, although they were not related. When asked if the furniture had been paid for, he said that it had not been paid for. He stated further that he had been living with a girl named Carolyn Fike, that she had made most of the purchases on the Palmer account although he had made a few purchases thereon. He stated that she had left him and that he did not know of her whereabouts. He acknowledged that some of the sales slips found in the bedroom of his apartment had been signed by him. He also admitted having filled out the change of address forms for the Palmer account after he had failed to receive a charge card in the name of James Palmer. When defendant was shown the documents (found in his bedroom) involving the real James V. Palmer account, he stated that it was not uncommon for May Company employees to take such records to their homes. When told by Officer Ferguson that all of the furniture found in his apartment had not been paid for and that May Company was entitled to have it returned, he stated that "that was all right." Shortly thereafter, Fisk telephoned United Parcel, a truck arrived, and the furniture was removed from the apartment. Defendant was then taken into custody.

On the following day Officer Ferguson and Sergeant Reicker talked to the defendant in the county jail. Defendant was again advised of his right to remain silent, that he was entitled to the services of an attorney and that anything he might say could be used against him in court. Again his statements were freely and voluntarily made. In response to questions relating to the applications, the change of address forms, and the sales slips, the defendant stated that he had filled out the two applications in Palmer's name in order to show Carolyn Fike the manner in which May Company applications were filled out and rated. He also showed Carolyn how a change of address was affected. When asked whether Carolyn was working for May Company defendant replied that she was not. When Officer Ferguson asked why Carolyn would be interested in learning how to complete these forms, defendant stated that she had mentioned that she might like to go to work for the May Company at some time. When told that his was a rather unusual story and that it conflicted with his previous story defendant said that "that was the fact, anyhow." When he was asked by Officer Ferguson as to how

Carolyn Fike would be able to get possession of certain of the documents (sales slips), defendant replied that he did not know, but that if he was given bail he might be able to find out. He inferred that there were many things going on at May Company that he could uncover if the police released him.

Defendant called 12 witnesses in his defense, two of whom had testified for the prosecution. Defendant did not testify in his own behalf. The testimony of these witnesses did not produce any material conflict with the evidence produced by the People and it would unnecessarily burden this record to summarize their testimony herein.

### The Law as Applied
### to the Evidence

Defendant urges that he was arrested without probable cause. There is no merit in this contention. Prior to the defendant's arrest Officer Ferguson was informed from reliable sources that a man and a woman had attempted to purchase merchandise on the Palmer account and when the employees of May Company had sought to check the credit rating of the account the prospective customers had hurriedly left the store premises, that subsequent investigation had disclosed that the account application had been written on a form used only by May Company employees and not by customers and that the male customer's description tallied with the description of the defendant. Officer Ferguson did not act upon this information, but requested the May Company to obtain further facts. After further investigation by the May Company, Officer Ferguson was reliably informed that the real James Palmer had denied that he purchased the merchandise in question, that he gave anyone permission to do so and charge his account therefor, that he had changed his address or ordered a change of address relating to his account. He was further reliably informed that the real Mr. Palmer's name and account number matched the name and number which had been used by the persons who had charged items to the account. He was reliably informed that there was a shortage of approximately $8,000 in the May Company's P to S accounts and that the sales slips on purchases made had been destroyed. He was informed that a member of May Company's credit department had observed a color television set in the defendant's apartment located at 1564 South Beverly Drive and that the address given on the false Palmer account differed from the address listed in defendant's personnel file.

In addition to the foregoing, Officer Ferguson's independent investigation disclosed that the defendant had an arrest for forgery, that the description of the man who had, two days prior to the date of the arrest, used a James V. Palmer credit card and who had hurriedly left the store when referred to the credit department, tallied with the description of the defendant. Officer Ferguson also knew that defendant's apartment and the telephone therein were listed under the name of Palmer. He knew that defendant had unexpectedly failed to report for work on the day that the arrest was made. At defendant's apartment, shortly before he was placed under arrest, defendant identified himself to Officer Ferguson as James Palmer; at this point he was immediately identified by a fellow employee, in the presence of the arresting officer, as Edward Turner.

"A peace officer may make an arrest . . . without a warrant. . . .

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it." (Pen. Code, § 836.)

"Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. ██ There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case. Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] ██ Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial." (*People* v. *Ingle,* 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577].) ██ The record discloses that the information possessed by Officer Ferguson was sufficient to fulfill the requirements of probable cause for making the arrest. (*People* v. *Boyles,* 45 Cal.2d 652, 656 [290 P.2d 535].)

Defendant next urges that he was denied the right against illegal search and seizure in violation of the Fourth Amend-

ment to the federal Constitution as embodied in the Fourteenth Amendment to the federal Constitution and in violation of the Constitution of the State of California. This contention is based upon the claim that Fisk and Siverson, both agents of the May Company, who had accompanied Officers Ferguson and Schott to defendant's apartment on the day of the arrest, and who, along with the officers, were admitted to the defendant's apartment without objection on his part, made an unauthorized and illegal search of the apartment which resulted in the discovery of the May Company's accounting records later used in evidence against him. ■ The arrest of defendant occurred inside the apartment and as heretofore pointed out there was probable cause for the arrest. The search that ensued was incidental to the arrest and produced documents used in the commission of the crime and therefore such documents were not immune from seizure. (Pen. Code, § 1524, subd. 4; *People* v. *Thayer,* 63 Cal.2d 635, 642 [47 Cal.Rptr. 780, 408 P.2d 108].) It is said that a lawless search and seizure by a private person acting in a private capacity is not a violation by a state or federal agency of constitutional guarantees. (*People* v. *Tarantino,* 45 Cal.2d 590, 595 [290 P.2d 505].) An unlawful search and seizure, however, conducted by a private citizen while acting under the direction of a police officer may not be upheld on the grounds that the person making the search was a private citizen. Under these circumstances it is said that the private citizen is acting as the agent of the police. (*People* v. *Tarantino, supra,* p. 595.) He is acting as the arm of the police. (*Moody* v. *United States* (D. C. 1960) 163 A.2d 337, 340.) ■ Where a police officer, accompanied by two private citizens, makes a lawful arrest based upon probable cause and thereafter a search is made incidental to such arrest by the two private citizens under the direction and supervision of the arresting officer and papers are seized which are not immune from seizure, the constitutional right of the defendant against unlawful search and seizure has not been violated. The right of the private citizen to search and seize under these circumstances is measured by the right of the arresting officer to search and seize, and if the arresting officer had the right and chose to exercise it through a private citizen acting in his presence and under his immediate direction, this affords no ground for complaint by the defendant.

In the case at bench Officers Ferguson and Schott were in defendant's apartment at all times during the search that was

conducted by Fisk and Siverson. When accounting records of the May Company were found they were shown to the police officers and delivered into their possession. Had the search not been made by Fisk and Siverson then Officers Ferguson and Schott would have made the search as incidental to the arrest and as part of their duties in connection therewith. It was not unreasonable for the arresting officers to permit the agents of May Company to make the search in their presence and under their direction as such agents would more easily than the officers recognize the accounting records of May Company used in the commission of the crime, and which might be found in the defendant's apartment. Fisk and Siverson in conducting their search were acting as the arm of the arresting officer. (Pen. Code, § 839.[3]) Under the circumstances here shown there was no violation of defendant's constitutional right against unlawful search and seizure.

█ Defendant urges that the evidence is insufficient to support the judgments of conviction. While the evidence pointing to defendant's guilt of the crimes charged is circumstantial in some areas of the case, it cannot be said that it is not substantial and that it does not sustain the jury's finding of guilt to a moral certainty and beyond a reasonable doubt. The evidence not only is consistent with the hypothesis of guilt of the crimes of which he was charged but it is inconsistent with any other reasonable hypothesis. (*People* v. *Jones,* 232 Cal. App.2d 379, 388 [42 Cal.Rptr. 714].) There is no merit in this contention.

Defendant urges that he was denied the right to due process of law secured to him by the Fifth Amendment to the federal Constitution as embodied in the Fourteenth Amendment to the federal Constitution, and in violation of the Constitution of the State of California. Defendant's argument under this contention is a reiteration of his argument relating to his claims of false arrest and unlawful search and seizure and has been sufficiently covered in other parts of this opinion.

█ Defendant urges that he was denied the equal protection of the laws of the State of California as guaranteed to him by the Fourteenth Amendment of the federal Constitution and by the Constitution of the State of California. Under this contention he again argues that he was arrested without

---

[3] "Persons making arrest may summon assistance. Any person making an arrest may orally summon as many persons as he deems necessary to aid him therein."

probable cause but adds that at the trial he was deprived of the right to be represented by counsel. The record in this connection discloses that the defendant was represented by counsel of his own choice at all stages of the proceedings up to the date of the trial. At the time of his plea he moved the court for permission to proceed in propria persona and to retain Mr. G. H. Chula, his then counsel, in an advisory capacity. This motion was denied. Again, just prior to the commencement of trial, defendant insisted that he be permitted to proceed in propria persona and have Mr. Chula stand by in an advisory capacity and the trial judge refused to permit him to proceed in such manner. Defendant represented to the court that he was very familiar with court procedure, having appeared many times in court in connection with the collection of accounts from 1957 to 1964. When defendant was again denied the right to have his counsel sit by in an advisory capacity while he tried the case himself, he stated that he would represent himself. ■■■ It is well settled that a defendant has no absolute right to the services of an attorney in a purely advisory capacity. (*People* v. *Ashley*, 59 Cal.2d 339, 361 [29 Cal.Rptr. 16, 379 P.2d 496]; *People* v. *Mattson,* 51 Cal.2d 777, 789 [336 P.2d 937].)

■■■ The record discloses that defendant rejected the services of counsel of his choice and knowingly and effectively waived his right to counsel. He was not forced to represent himself but he chose of his own free will to do so. (Cf. *People* v. *Linden,* 52 Cal.2d 1, 18 [338 P.2d 397].) It is also suggested under this point that defendant did not receive a fair trial because of the alleged bias and prejudice toward him of the trial judge because he was not an attorney and did not know how to defend himself or to conduct a trial. This is not borne out by the record of the trial. At one stage of the proceeding the trial court complimented the defendant by stating, ''you did a beautiful job'' in raising and presenting the issue of unlawful search and seizure. The record also discloses that the trial judge on numerous occasions made objections on behalf of the defendant, advised him on points of law and otherwise protected his interests. (Cf. *People* v. *Mattson, supra,* p. 785.)

Defendant has been represented on this appeal by counsel appointed by the court. The defendant has filed a brief in propria persona in addition to the brief filed herein by his counsel. The brief contains some 227 pages. We have examined

this brief and the numerous contentions raised therein and we find them to be without merit.

The judgment is affirmed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied April 14, 1967, and appellant's petition for a hearing by the Supreme Court was denied May 24, 1967.