[Crim. No. 16373.  Second Dist., Div. Five.  Feb. 27, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT WILHELM WOLDER et al., Defendants and Appellants.

## Counsel

Arthur J. Rubinsteen and Edward J. Horowitz, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Elizabeth Miller and James L. Markman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**FRAMPTON, J. pro tem.*—**

### Statement of the Case

Defendants were jointly charged by information with the crime of burglary, a felony. (Pen. Code, § 459.) By amendment to the information Wolder was alleged to have suffered prior felony convictions for forgery, burglary, violation of section 11530 of the Health and Safety Code, and robbery, and to have served a term in state prison upon each such prior. Burch was alleged to have suffered a prior conviction for robbery, and to have served a term of imprisonment therefor in state prison. Motions under section 995, Penal Code were made and denied. Each defendant entered a plea of not guilty and respectively denied the allegations of prior convictions. Motions pursuant to section 1538.5 of the Penal Code were made and denied. Defendants personally and their counsel waived the right of trial by jury as to the substantive offense and as to the truth of the alleged priors. The record discloses that on the trial of the issue of guilt or inno-

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

cence, two witnesses were sworn and testified on behalf of the People. At this stage of the proceedings each defendant withdrew his plea of not guilty, was rearraigned, and entered a plea of guilty to burglary in the second degree. Exhibits were received in evidence bearing upon the allegations of prior convictions and the allegations were found to be true as to all priors. A probation report was ordered. Motions to set aside the court's rulings under the motions made pursuant to section 1538.5, Penal Code, were denied. Proceedings were suspended as to Burch, and he was placed on probation for the period of five years on condition, among others, that he spend the first year thereof in the county jail. Probation was denied as to Wolder, and he was sentenced to state prison. The appeals are from the judgments based upon the denials of the motions under section 1538.5, Penal Code, after pleas of guilty. (Pen. Code, § 1538.5, subd. (m).)

### Statement of Facts

On September 12, 1968, Joe W. Morrill, a sergeant of police for the City of Long Beach, attached to the commercial burglary detail of the detective bureau, received information through the mail directed to the Long Beach Police Department from the Los Alamitos Police Department, to the effect that the defendant Wolder had been interrogated by members of the Los Alamitos Police Department in the early morning hours in the vicinity of a late model Pontiac which had been stolen in the City of Long Beach. The Pontiac had blocks under its wheels and it was inferred that the wheels and tires were to be removed from it. Wolder was either in or adjacent to an Oldsmobile. The license number of the Oldsmobile was given in this communication as well as a physical description of Wolder. The information also indicated that the defendant Burch was with Wolder at the time of the interrogation.

Subsequently, Sergeant Morrill caused a bulletin to be prepared for distribution to members of the police department stating in substance that the defendants had been interrogated in the vicinity of the stolen Pontiac, that Morrill was familiar with Robert Wolder, that Wolder was a versatile burglar, and an adept safe burglar. Sergeant Morrill's information, which was placed in the bulletin, was based upon his personal knowledge and on the information he had received from the Los Alamitos Police Department.

Joseph Donnelly, a police officer for the City of Los Angeles, had a daughter named Margaret who, on September 13, 1968, resided in an apartment at 5861 Walnut Avenue in the City of Long Beach. About 7 p.m. on the 13th, Officer Donnelly, in company with Mr. D'Cardova, whose daughter lived with Margaret at the above address, went to the

apartment complex to talk to Mr. Hardt, the owner, concerning the eviction of the girls from their apartment. Hardt had called D'Cardova about the eviction, and D'Cardova had called Donnelly. When they arrived at the location, Donnelly had a conversation with Hardt, who lived in the duplex adjoining Margaret's apartment and who had rented the apartment to Margaret.

During this conversation Hardt remarked that Margaret's "Uncle Bob had brought a bunch of cases of something and stored them in the garage that had belonged to Margaret's grandmother." Hardt had not rented the garage to Margaret or anyone else, and had retained custody of the keys thereto.

The conversation with Hardt caused Donnelly to become suspicious as he knew that his daughter Margaret did not have an "Uncle Bob," or a grandmother. Donnelly then asked Hardt if he could look at the items stored in the garage and Hardt said "Yes."

Donnelly then went to the garage with D'Cardova and Hardt. There was a padlock on the garage door. Hardt had the key and unlocked the door. Donnelly, D'Cardova and Hardt then entered the garage. In the front center of the garage were cases, cardboard containers about 3 to 4 feet in height, some smaller and some larger.

Some of the containers were sealed and some were unsealed. Donnelly did not open any that were sealed. He "was curious as to what could have belonged to Peggy's [Margaret's] so-called grandmother." He opened the cardboard flaps of the unsealed cases and looked inside them. He first observed a box that contained four portable typewriters bearing the name "Royal." In another container he observed a large typewriter or some type of office machine. There was an open briefcase in front of the containers in which Donnelly observed some tools, two blue smocks and some gloves. He observed a zippered bag sitting behind the briefcase which contained quite a few tools. Donnelly observed pry bars and a drill among the tools. Based upon his 21 years' experience as a police officer during which time he had investigated at least 50 burglaries, the tools that he saw appeared to him to be burglar tools.

Donnelly had no warrant to make a search, and at the time he looked into the unsealed containers, he knew nothing about a bulletin from the Long Beach Police Department describing the defendants. After looking into the unsealed containers he believed that the flaps of the containers were left loose.

Donnelly, D'Cardova and Hardt then left the garage and the latter placed the padlock on the door and returned to his apartment. Hardt had given

Donnelly and D'Cardova the description of male persons who had been around the garage. Donnelly called the Long Beach Police Department the same evening and met two officers who responded to the call about two blocks from the apartment. He gave the two Long Beach officers the substance of the information he had. Previously on the telephone, Donnelly had given Officer Lance of the Long Beach Police Department the substance of the information he possessed. This call was placed about 8 p.m. on the 13th.

About 10 p.m. on September 13, 1968, Sergeant Rudolph F. Roop, Officer Lance's partner, received information from Donnelly and D'Cardova on a street corner in North Long Beach. On the way out to meet Donnelly, Officer Lance had told Sergeant Roop that Donnelly had become alarmed because his daughter Margaret was linked with property stolen from the Royal Typewriter Company which was in the garage behind the location where she lived.

Donnelly told Sergeant Roop and Officer Lance that he had been having trouble with his daughter associating with what he considered to be bad companions throughout the summer. He gave Sergeant Roop and Officer Lance his daughter's address, 5861 Walnut.

Donnelly told the officers that he went to see and conversed with Hardt, the owner of the property where the girls rented the apartment, and that Hardt had told him "that he was storing some things for his daughter in the garage that had been given her by her grandmother." Donnelly stated to the officers that his daughter did not have a grandmother and that nobody could have given her anything. He told the officers that he became curious, that Hardt took him into the garage and that they found several cartons of what appeared to be brand new typewriters, some tools and walkie-talkie radios. Donnelly informed the officers that he thought there had been a burglary of the Royal Typewriter Company.

Sergeant Roop and Officer Lance went to 5861 Walnut where they met and talked to Hardt. They told Hardt they would like to see the typewriters, and Mr. Hardt said, "Certainly." Hardt then got the keys, went to the garage, and opened the door. He led the officers into the garage and pointed out the typewriters. The typewriters were in cardboard boxes just inside the door of the garage. The cardboard boxes were arranged so that some were on top of others. Some of the cardboard boxes were inside larger cardboard boxes. All of the boxes had been opened and had been tied with cord. They untied the cords on one or two boxes and observed typewriters therein bearing the name "Royal." The boxes were the original boxes in which the typewriters had been shipped and the officers obtained serial numbers from the information contained on the outside of the boxes.

After the officers spoke with Donnelly and Hardt and before they entered the garage and took the serial numbers, they believed that the typewriters in the garage were stolen because of the number of different types of machines, portables, standard, electric, as well as an adding machine, which had been described to them, and because Margaret's situation was such that she would have no reason to have that many new machines.

The officers went back to Hardt's apartment and called the record bureau to ascertain whether the typewriters had been reported stolen. It was determined that the typewriters had been stolen from the Royal Typewriter Company. While they were on the telephone to the record bureau, the officers asked that another detective unit be sent out to assist them and that such unit bring a copy of the report. Over the telephone, the total loss was given to Sergeant Roop. Sergeant Roop and Officer Lance noted that the loss included a portable AM-FM radio.

Mr. Hardt told the officers that Margaret had come to him and asked if "they" could store some things in the garage temporarily. He said that he gave his permission and unlocked the garage door. Mr. Hardt told the officers that he did not give her a key, but merely opened the garage for her and allowed her friends to move those things in. He stated that Margaret identified one of the friends as her uncle and the other man as a friend of her uncle. He gave the officers a physical description of each man. During the conversation about Margaret's uncle, Mrs. Hardt said that the uncle seemed like a very nice man in that he had given Margaret a table model radio.

The officers went to the other unit of the duplex occupied by Margaret and her friend. When they arrived there, the door was unlocked. They walked in and maintained a stakeout at that location. When they entered the apartment, the officers had no warrant. Sergeant Roop did not have permission from either occupant to enter the apartment. He knew that the two girls resided there. The officers knew that nobody was at home.

A. J. Summers was a police officer for the City of Long Beach assigned to the detective division, commercial burglary detail. At about 8:30 or 9 in the morning on September 14, 1968, he went to 5861 Walnut Avenue in the City of Long Beach with Officer Burdsel. When they arrived at that location, Sergeant Roop and Officer Lance were there.

Prior to going to the Walnut Avenue address, Officer Summers had seen a crime report concerning a burglary at the "Royal office equipment" in the City of Long Beach and also the bulletin prepared by the police department based upon the communication received from the Los Alamitos Police Department concerning the defendants. Officer Summers received a physical description of two white males and two females who had been

seen at the duplex from Sergeant Roop. One of the descriptions matched the description of Wolder contained on the bulletin. Officer Summers also received information that the name of one of the male persons who had put typewriters in the garage was "Uncle Bob."

Sergeant Roop had also given Officer Summers the description of two vehicles, a 1960 Oldsmobile, tan over white, and a blue Volkswagen. He also gave Officer Summers two possible license plate numbers for the Oldsmobile which compared very closely to the license number contained in the information received from the Los Alamitos Police Department, and which had been placed in the Long Beach Police Department bulletin.

Officer Summers looked at one typewriter in the apartment at 5861 Walnut Avenue. He took up a stakeout at that location. He arrested Wolder about 10 a.m. on September 14, 1968, at the Walnut Avenue address as Wolder was stepping in the back door of the premises. He made the arrest because Wolder matched the description given by Sergeant Roop of the person seen taking boxes of typewriters into the garage, who had been seen at the duplex, who was named in the police bulletin, and who was known to the police to be an office machine burglar. Officer Summers also thought that the name "Uncle Bob" could be a nickname for Robert.

After placing Wolder under arrest, Officer Summers was present when the typewriters were removed from the garage. He took the typewriters and tools into his custody.

### Defense

In September of 1968, Miss Margaret Donnelly was living at 5861 Walnut Avenue. Mr. Hardt was her landlord. On the Monday prior to September 13, 1968, Margaret made an arrangement with Mr. Hardt to use the garage on his premises. Goods were moved into the garage after she made the arrangement. On Wednesday, September 11, she was last in the garage. Wolder was with her. He left the garage with her.

There were five, possibly seven boxes in the garage located in the center toward the front. All of the boxes were sealed with postal tape except two which had the seals ripped off. The boxes were all closed so that one could not see into them. The flaps were down on the boxes which had the tape torn off. Wolder and Burch put the boxes in the garage. There were typewriters in the boxes, but the labels on the boxes indicated that they contained china, pots and pans, and various things.

Wolder broke the tape on two of the boxes on the night of September 11, and took something from them. After removing the objects from the boxes Wolder closed the flaps but did not reseal the boxes. He placed heavier boxes on top of the boxes which had been opened. On September 11, the

tools, gloves and smocks were inside of one of the larger sealed boxes. To Margaret's knowledge, no one was in the garage between September 11 and September 13 after she had left it.

### Contentions on Appeal

Burch urges that (1) Donnelly engaged in an unlawful search when he opened the cardboard boxes in Mr. Hardt's garage; (2) Sergeant Roop illegally searched the boxes in Mr. Hardt's garage, and (3) a typewriter and radio discovered in Margaret's apartment were the product of an illegal entry by Sergeant Roop and Officer Lance.

Wolder urges that (1) Sergeant Roop illegally searched the boxes in Mr. Hardt's garage; (2) the typewriter and radio discovered in Margaret's apartment were the product of an illegal entry by Sergeant Roop and Officer Lance, and (3) his confession should have been suppressed as the product of an arrest tainted by the officer's illegal entry into Margaret's apartment.

### Search by Donnelly

■ The Fourth Amendment prohibition against unreasonable searches and seizures does not apply to searches by persons acting in a private capacity. (*People* v. *Tarantino,* 45 Cal.2d 590, 595 [290 P.2d 505]; *People* v. *Turner,* 249 Cal.App.2d 909, 926 [57 Cal.Rptr. 854]; *People* v. *Wright,* 245 Cal.App.2d 265, 269 [53 Cal.Rptr. 844]; *People* v. *Randazzo,* 220 Cal.App.2d 768, 769 et seq. [34 Cal.Rptr. 65].) ■ The record discloses that Mr. Donnelly, although a police officer for the City of Los Angeles, acted as a private citizen when he sought and obtained permission to enter Mr. Hardt's garage and to examine the boxes which he was informed his daughter had stored there. He was concerned about his daughter's association with "bad companions." He had gone there with the father of his daughter's roommate to discuss the matter of the girls' eviction with Mr. Hardt, their landlord. When he went to Long Beach, Mr. Donnelly was unaware of his daughter's involvement in a burglary. When the garage was opened and he saw a large office machine and what appeared to him to be burglar tools which he had been told were stored there by Margaret's "Uncle Bob," he called the Long Beach Police Department rather than take official action himself. It is questionable whether Mr. Donnelly had authority, under the circumstances, to take official action as a police officer for the City of Los Angeles with respect to a crime committed in the City of Long Beach. (Cf. *People* v. *Sandoval,* 65 Cal.2d 303, 311-313 [54 Cal.Rptr. 123, 419 P.2d 187]; *People* v. *Alvarado,* 208 Cal. App.2d 629, 631 [25 Cal.Rptr. 437]; *People* v. *Garner,* 234 Cal.App.2d 212, 226-227 [44 Cal.Rptr. 217]; *People* v. *Cheatham,* 263 Cal.App.2d 458, 461 [69 Cal.Rptr. 679].) The conduct of Mr. Donnelly in lifting the

flaps on the unsealed cartons and looking inside at the contents, under the circumstances here shown, did not violate the prohibition against unreasonable searches and seizures.

### Search by Sergeant Roop

When Sergeant Roop talked to Hardt on the premises at 5861 Walnut Avenue, he was in possession of reliable information that typewriters, which he had reasonable cause to believe had been stolen, were stored in Mr. Hardt's garage. Hardt was the owner of the property and was in exclusive possession of the keys to the garage. Officer Roop was justified in concluding that Hardt had the authority over his property that he purported to have, that is, to allow Officer Roop to enter the garage and observe its contents. (*People* v. *Gorg,* 45 Cal.2d 776, 783 [291 P.2d 469]; *People* v. *Smith,* 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222].) Officer Roop's entry into the garage was made in good faith with the consent of the owner of the property. (*People* v. *Hill,* 69 Cal.2d 550, 554-555 [72 Cal.Rptr. 641, 446 P.2d 521.)

Sergeant Roop testified that when Mr. Hardt took his key, unlocked the garage and opened the door there was no mistaking that the boxes contained typewriters. He made a cursory count to determine how many machines were there. He obtained the model and serial numbers of two typewriters from the exterior of the boxes. Some of the boxes were the original boxes in which the machines had been shipped and these boxes contained the shipping information, serial number and model on the outside of the box. It was determined definitely from these serial numbers that the typewriters had been reported stolen from the Royal Typewriter Company, after having checked them with information on file with the record bureau. He testified further that during the inspection of the boxes, he lifted the flaps on one or two of the boxes that had been opened, but did not lift the typewriters from the boxes to obtain serial numbers from them. The record is not clear as to whether Sergeant Roop had to lift the flaps of the carton in order to obtain the serial numbers of the two typewriters which he later telephoned to the record bureau for verification as to whether these two specific typewriters had been reported stolen. The record is abundantly clear, however, that before looking at the serial numbers on the two typewriters, Sergeant Roop, from the totality of the information given him by Donnelly and Hardt, and from his observation of the cartons stacked in the garage, without lifting the flaps on any of them to peer inside, had probable cause to believe, and did believe that the typewriters had been stolen in the course of a burglary from the Royal Typewriter Company in the City of Long Beach. Further, the record discloses that the trial judge found, in denying the motion under section 1538.5, that the two serial numbers obtained by

Sergeant Roop added nothing material to the information already possessed by the officers as it related to the question of probable cause to make an arrest when the two men, or either of them, who had been described as having placed the typewriters in the garage, appeared upon the premises.

### Illegal Entry Into Margaret's Apartment

The defendants urge that Sergeant Roop and Officer Lance illegally entered Margaret's apartment, and that a typewriter and radio discovered in the apartment should have been ordered suppressed.

■ Penal Code section 1538.5, subdivision (m) requires that the trial court be given notice of the evidence to be suppressed and the grounds for that suppression before an appellate court may consider the trial court's failure to suppress that evidence as a ground for reversal. (*People* v. *Rose,* 267 Cal.App.2d 648, 651-652 [73 Cal.Rptr. 349]; *Thompson* v. *Superior Court,* 262 Cal.App.2d 98, 103-104 [68 Cal.Rptr. 530].)

Here, the defendants did challenge the officers' entry into Margaret's apartment. However, after this challenge the following colloquy took place: "[MR. BARNETT, Counsel for Defendants]: Now, there is another issue here and that is entry of the apartment, which I think is clearly demonstrative of violation of Section 844 of the Penal Code. The officer testified he knew no one was there. He had no warrant nor consent from anyone to enter it other than the landlord and knowing the rest, he entered and noticed, but consent of the landlord is not applicable. So that entry is clearly illegal.

"However, as I have indicated, the key issue in this case is not that entry but the entry into the garage in search of the boxes there.

"THE COURT: Well, there is no evidence here from that entry at all, is there?

"MR. BARNETT: Well, he said they saw the radio inside, I believe, your Honor, which matched a radio taken as contraband.

"However, as I have indicated, it really all relates back to the search of the garage. I don't think we need really get to that point. I think that it's clear that the entry of the apartment was illegal. But I also think that it's kind of a tangential issue insofar as the meat of this case is concerned. Now, that is the position of the defendants."

The record of the trial does not indicate that a radio actually was seen by the officers in Margaret's apartment. Mention is made by Sergeant Roop in his testimony at the preliminary examination of having seen a radio and typewriter in Margaret's apartment which matched the description of a radio and typewriter reported as stolen. This testimony was not before the court in passing on the motion under section 1538.5 of the Penal Code.

Officer Roop in his testimony related a conversation in which Mrs. Hardt told him that "Uncle Bob" had given Margaret a table model radio. Officer Summers stated that when he went to the apartment at 5861 Walnut Avenue with Officer Burdsel he looked at one typewriter in the apartment.

After the court stated that there was no evidence before the court based upon the officers' entry into Margaret's apartment, and defense counsel stated that the matter all related to the search of the garage and "I don't think we need really [to] get to that point," referring to the search of the apartment, there was no further reference to the suppression of evidence found in the apartment. In this state of the record we do not believe that the trial court was given adequate notice that the defendants' motion under 1538.5 was directed to the suppression as evidence of the radio and typewriter in Margaret's apartment. Having failed to urge the suppression of these items before the trial court they may not now urge that the court's failure to suppress them was improper. ■ The numerous items found in the garage comprised the bulk of evidence connecting the defendants with the burglary charged against them, and we are convinced that such evidence rather than the two items found in the apartment induced the defendants to enter pleas of guilty. Therefore, the trial court's failure to suppress the items seen in Margaret's apartment was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

### Confession of Wolder

■ Wolder urges that his arrest was tainted by the officers' entry into Margaret's apartment and that, therefore, a confession he made subsequent to the arrest should have been suppressed.

Wolder refers to the evidence taken at the preliminary examination as showing that he confessed following his arrest. As heretofore pointed out, the testimony taken at the preliminary examination was not before the trial court on the motion to suppress under section 1538.5, and counsel never attempted to suppress the admission in evidence of such confession. In this state of the record, we may not consider the trial court's failure to suppress the confession as a ground for reversal. (*People* v. *Rose,* 267 Cal. App.2d 648, 651-652 [73 Cal.Rptr. 349]; *Thompson* v. *Superior Court,* 262 Cal.App.2d 98, 103-104 [68 Cal.Rptr. 530].)

The judgments are affirmed.

Kaus, P. J., and Reppy, J., concurred.