[Civ. No. 29669.   Second Dist., Div. Two.   Oct. 18, 1966.]

CHARLES L. DROUET, Plaintiff and Respondent, v. BILL
D. MOULTON, Defendant and Appellant.

Hollopeter & Terry and Don H. Terry for Defendant and Appellant.

Dally, Clark & White, and Robert C. Clark, for Plaintiff and Respondent.

ROTH, P. J.—Bill D. Moulton, appellant, owned a tavern in Pasadena, known as Barnacle Bill's, the operation of which was being investigated by the Alcoholic Beverage Control Board (ABCB). Pending the investigation, Moulton sold the tavern to defendant Charles L. Drouet, respondent. An escrow for the sale was opened on November 26, 1962. The escrow was closed in early July 1963. On March 17, 1963, following the transfer to him of the on-sale beer license, Drouet took over the operation of the business.

A conditional sales contract for the purchase of Barnacle Bill's for $13,400 was executed by the parties on April 11, 1963. The contract provided, in part, for acceleration by the seller of the payments remaining on the purchase price if the seller should feel ''insecure'' or deem the property sold under the contract in danger of misuse or confiscation.

In August a hearing was held before the ABCB on an accusation by neighbors that the tavern was operated in a disorderly manner. The ABCB revoked Drouet's on-sale beer license, but stayed its decision pending appeal. On October 4, 1963, Moulton sent written notice to Drouet, based on the ''insecurity'' clause, demanding payment of the balance due

under the contract. Drouet refused either to comply with this demand or post a bond to secure the remaining payments. Moulton filed suit seeking specific performance of the acceleration clause in the sales contract.

In response, Drouet filed an action against appellant for breach of contract, fraud, and for the malicious interference with the operation of Barnacle Bill's. The two suits were consolidated for trial.

The evidence in support of Drouet's separate action for breach of contract, fraud and malicious interference, showed without any substantial contradiction that within two weeks after the change of ownership of the business, Moulton, without provocation, while drinking at the tavern, poured beer over a patron's head, as a consequence of which a fight ensued. The police were called to settle the disturbance.

On another occasion, Drouet noticed many patrons leaving the premises, and on investigation, discovered Moulton urinating on the dance floor.

After said incidents, Moulton was told not to return to the tavern. Drouet testified that he informed Moulton: "If he wanted to talk to me about this business we had going of any type, he was welcome to call, make an appointment and I would see him, but I didn't want his patronage. *I didn't want to run all the customers off.*" (Italics added.)

Evidence was presented that on one occasion, in August 1963, when Moulton was denied admission to Barnacle Bill's, he summoned the police riot squad on a false complaint that a riot was about to take place on the premises.

The record also shows that pursuant to his attempts to accelerate payments on the contract, Moulton on three occasions, purusant to legal process, had the sheriff of the county appoint a keeper to take charge of all receipts of the tavern.

Each occasion when a keeper was placed in charge of the tavern, occurred on a weekend. While Drouet might have continued to operate the business with the keeper present, he testified that the keeper retains all funds collected. "He [referring to the keeper] has got a bag. The County takes them. He even takes the money out of the cash register just to start with. Everything."

The trial court found that appellant was unjustified in his attempt to accelerate payment of the $6,343.74 remaining on the contract. It further found that appellant "with the intent to destroy [respondent's] business and to regain control of the business for himself, wilfully and maliciously attempted to

drive [respondent's] customers away by disruptive acts of violence, intimidation, revulsion, and coercion.'' The court awarded respondent $2,500 general damages and $5,000 exemplary damages and costs.

Appellant does not challenge the sufficiency of the evidence to support a verdict in respondent's favor for malicious interference with a business. He does not contest the propriety of the award of exemplary damages, nor dispute their amount.

■■■ Appellant contends solely that since no business records were submitted and there was *no* other direct or specific evidence of loss of profits or diminution in the value of respondent's business, that an award of general damages is without evidentiary support.

Appellant's point appears to be that since no books or records of the operation of the business, nor details of receipts and disbursements, daily, weekly or monthly, were introduced into evidence, that there has been no proof of any actual damage; and since no actual damage has been proven with reasonable certainty, there can be no award for exemplary damages.

Predicated upon the lack of any arithmetical evidence, appellant argues:

''Where an established business is wrongfully interrupted and injured, the proper measure of damages is the diminution in value of the business traceable to the wrongful act, as reflected by loss of profits, expenses incurred or similar evidence of injury.'' (*Steiner* v. *Long Beach Local No. 128*, 19 Cal.2d 676 [123 P.2d 20]; see also *Lambert* v. *Haskell*, 80 Cal. 611 [22 P. 327]; *Barnes* v. *Berendes*, 139 Cal. 32 [69 P. 491, 72 P. 406].)

■■■ Generally speaking, there is no doubt that when the operation of a business is interrupted by wrongful acts, damage, whether of prospective profits or otherwise, should be ascertained with reasonable certainty from the past volume of business and other provable data, generally of a mathematical nature, relevant to what the profits were and what profit probabilities would have been or would be if the wrongful act had not been perpetrated. (*Grupe* v. *Glick*, 26 Cal.2d 680, 692 [160 P.2d 832]; *Myers* v. *Stephens*, 233 Cal.App.2d 104, 118 [43 Cal.Rptr. 420].)

■■■ It is also true, however, that ''[t]his rule does not apply to uncertainty as to the *amount* of the profits which would have been derived, *but to uncertainty* or speculation as to *whether the loss of profits was the result of the wrong and*

whether any such profits would have been derived at all.''
(Italics added.) (*Continental Car-Na-Var Corp.* v. *Moseley,* 24
Cal.2d 104, 113 [148 P.2d 9].)

Although no books or other records showing past
receipts and disbursements were introduced by Drouet or
demanded on cross-examination by Moulton, there are, aside
from general deductions of damage that can be made from the
record, several uncontradicted facts from which it is not too
difficult to deduce actual money damage. Among these are:

1. Moulton himself valued the business at $13,400 when a
sale thereof to Drouet was actually consummated on October 4,
1963. He commenced his action to accelerate all payments
under the ''insecurity'' clause on May 10, 1964.

2. Within a few weeks after the sale, Moulton considered
himself insecure because proceedings had been commenced
before the ABCB against Drouet for revocation of the
tavern's license, which proceeding was predicated upon the
wrongful acts of Moulton.

3. The testimony of Drouet that he told Moulton to keep
away from the tavern because Drouet ''. . . didn't want
[Moulton] to run all the customers off.''

4. The proceedings before the ABCB which Drouet was
required to defend.

5. The admission of Moulton in his brief that Drouet did
not have to close his place of business when Moulton caused a
keeper to be placed in charge, ''. . . he had the option of
continuing the business . . . or removing the keeper by
placing a bond.''

6. The testimony of Drouet that his business was getting
better, until he closed when a keeper was placed in charge.

In our opinion, respondent has made a clear showing on
which the trier of facts could find, as he did, that loss of
profits, injury to the good will of the tavern and the creation
of extraordinary expenses resulted from appellant's acts.

Less than one month after the incidents detailed and found
to be true by the court, the accusation against Drouet for
disorderly operation was filed with the ABCB. The trial court
reasonably found that the incidents herein detailed, which
Moulton precipitated, were the cause for the proceedings to
revoke the license of the tavern. Rather than permit Moulton
to use the ABCB proceedings, which Moulton admits made
him insecure, as a basis for accelerating the payments under
the sale contract, and thus take advantage of his own wrong-
doing, the trial court properly recognized the ABCB proceed-

ings and the other incidents herein detailed, were a genuine injury to Drouet's business, as a consequence of which actual damage was suffered. It is obvious, too, that if the on-sale beer license is permanently revoked, Barnacle Bill's could no longer continue to operate as a tavern.

In a new business, and one where weekend receipts are likely to be heaviest, it was reasonable for Drouet to have elected to close rather than to continue to accumulate operating expenses without receipts coming in to meet them.

We recognize that the burden of proving damage with reasonable certainty is upon respondent. The record would assuredly be more solid if actual arithmetical evidence were introduced by respondent. However, on a showing such as made in the case at bench, it would seem that some duty rested upon appellant to make the effort to prove that his insecurity resulted from operation of the tavern—independent of his wrongful acts. When a business is closed or interfered with in the manner herein outlined, it is obvious that profits are being lost.

Viewing the evidence "in the light most favorable to respondent, with every legitimate inference drawn in [his] favor" (*Guillory* v. *Godfrey,* 134 Cal.App.2d 628, at p. 630 [286 P.2d 474]; citing *Murphy* v. *Ablow,* 123 Cal.App.2d 853, 858 [268 P.2d 80], it appears to us the evidence amply supports an award of general damages.

A wrongdoer should not escape liability for his wrong because damages cannot be measured with exactness. (*Zinn* v. *Ex-Cell-O Corp.,* 24 Cal.2d 290 [149 P.2d 177].)

Under the circumstances herein delineated, it is for the trier of fact to use the evidence available in assessing damages. "It is axiomatic that where substantial compensable injury is shown but the amount of the damage cannot be ascertained with reasonable certainty . . . , the question rests in the sound judgment and discretion of the trier of fact." (*Ojala* v. *Bohlin,* 178 Cal.App.2d 292, at p. 304 [2 Cal.Rptr. 919].) It cannot be said in this case that the trial court has abused its discretion.

Malicious interference with a business is a tort (*Guillory* v. *Godfrey, supra*) for which general damages may be recovered to the extent of the foreseeable consequences of appellant's conduct. (*Schuler* v. *Bordelon,* 78 Cal.App.2d 581 [177 P.2d 959].) These damages may include loss of profits, and injury to the value and reputation of a business. (*Ojala* v. *Bohlin, supra,* 178 Cal.App.2d 292.)

Appellant does not contest the trial court's finding of actual malice implied in its award of exemplary damages. ■ In awarding exemplary damages, the trier of fact has a wider discretion than in awarding compensatory damages. Its award "will not be disturbed unless it is grossly excessive or appears to have been the result of passion or prejudice." (*Boyes* v. *Evans*, 14 Cal.App.2d 472, 480 [58 P.2d 922].) We find no defect in the award of exemplary damages.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.