**FORRO PRECISION, INC.,**
**Plaintiff-Appellant,**

v.

**INTERNATIONAL BUSINESS MACHINES CORP.,**
**Defendant-Appellee.**

Nos. 78–1455, 78–1755.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1980.

Decided April 5, 1982.

Rehearing and Rehearing En Banc
Denied July 7, 1982.

Joseph M. Alioto, Alioto & Alioto, San Francisco, Cal., for Forro Precision, Inc.

Henry C. Thumann, Los Angeles, Cal., argued, for Intern. Business Machines Corp.; James V. Selna, O'Melveny & Myers, Los Angeles, Cal., on brief.

Before TRASK and FLETCHER, Circuit Judges, and MUECKE *, District Judge.

* Hon. C. A. Muecke, Chief United States District Judge for the District of Arizona, sitting by designation.

FLETCHER, Circuit Judge:

This action arises from a series of events in 1972 and 1973 that culminated in the search of the business premises of Forro Precision, Inc. (Forro) by the San Jose police, who were accompanied by and aided in the search by employees of the International Business Machines Corp. (IBM).[1] Forro brought suit against IBM on the basis of its participation in the search and other conduct damaging to Forro. IBM, in turn, counterclaimed against Forro.

After extensive pretrial proceedings, the claims by Forro were narrowed to contentions that IBM had intentionally interfered with prospective business advantage under California law and had monopolized and attempted to monopolize in violation of section 2 of the Sherman Act. 15 U.S.C. § 2 (1976). IBM's contentions were narrowed to a counterclaim under California law that Forro had misappropriated its trade secrets. A jury found in favor of Forro on the intentional interference claim and awarded actual damages in the amount of $2,739,010. It found in favor of IBM on the misappropriation claim and awarded actual damages in the sum of $260,777, but deadlocked on the antitrust claims and on both parties' claims for punitive damages.

The trial judge initially declared a mistrial on Forro's Sherman Act section 2 claims, but later entered judgment in favor of IBM on this aspect of the case. The trial judge further ordered that neither party recover punitive damages.

Both parties appeal, IBM from the judgment for Forro on the intentional interference claim and Forro from the judgment for IBM on the misappropriation claim. Forro also appeals from the dismissal of its

antitrust claims. This court has jurisdiction under 28 U.S.C. §§ 1291 and 1294.

## I

## FACTS

IBM designs, manufactures, and markets a complete line of electronic data-processing equipment. This lawsuit concerns disk drives and disk packs, which are one portion of the line. The function of disk drives and packs is to provide rapid storage and retrieval of data. The devices are components separate from the "main frame" of a computer, and, along with other modular equipment, are known as "peripheral equipment." Peripheral equipment designed to work with a manufacturer's main frame computer is termed "plug compatible." Companies other than IBM that manufacture such components are known as plug-compatible manufacturers, or "PCM's."

Forro is not a PCM, but rather is a manufacturer of precision metal parts purchased by PCM's for incorporation in peripheral equipment. Forro ordinarily manufactures components in accordance with drawings and specifications provided by its PCM customers. Forro has on occasion, however, offered parts manufactured under Forro's own "FP" designation.

During the late 1960's and early 1970's, IBM was developing a disk storage device called the 3330, or "Merlin." IBM announced the Merlin to the trade in June, 1970. The first customer shipment of the Merlin was set for August, 1971. Forro offered Merlin parts, under its own FP designation, in mid-1971, prior to IBM's shipment date. The date of shipment is significant because it is the first date upon which the devices could be acquired legitimately

---

1. This is the second case before this court involving the same course of events. The plaintiff in *Arnold v. International Business Machines Corp.*, 637 F.2d 1350 (9th Cir. 1981), was one of the persons implicated in the theft of IBM secrets. He brought an action under 42 U.S.C. §§ 1983 and 1985, on the theory that IBM violated his civil rights by giving false and misleading information to the San Jose Police that resulted in the search of his residence and in his arrest and subsequent indictment.

We there affirmed the trial court's grant of summary judgment to IBM because the plaintiff failed to show that IBM was the proximate cause of the search, arrest, and indictment. On the record of that case, we found no facts that indicated that IBM ultimately controlled the decisions of the police, and therefore IBM's actions could not be said to be the legal cause of the police actions that injured plaintiff.

and "reverse engineered." Prior to that time, detailed technical specifications would necessarily originate in IBM's shop.

In late 1970 and early 1971, IBM became aware of rumors that its security had been breached and that its new Merlin design was "out." These rumors were substantiated on two occasions, when companies in the industry voluntarily turned over to IBM Merlin drawings that had come into their possession. At about the same time, during discovery in a trade secret lawsuit brought by IBM against Memorex Corporation, IBM acquired information that led it to suspect that Forro had supplied to Memorex parts manufactured from Merlin designs.

Subsequently, in December, 1971, as part of its discovery in the *Memorex* lawsuit, IBM deposed Forro's president, Fowler, and its general sales manager, Knisely. At these depositions, Fowler and Knisely produced drawings of Merlin parts. They testified at the depositions in the *Memorex* case, and later at trial in this case, that Forro acquired the drawings in May of 1971 from a Mr. Shinn, an employee of another company, Sigma Technology. Shinn had submitted the drawings, which bore the Sigma Technology logo, to Forro as part of a request for a quote on the machining of certain of the parts. After verifying that the documents were authentic Merlin drawings, Forro intentionally submitted a very high bid and lost the Sigma Technology business. Forro copied the drawings prior to returning them to Shinn, and changed the Sigma Technology logo to a Forro logo. Forro subsequently offered for sale under its own FP designation Merlin parts manufactured from these drawings.

The Fowler and Knisely depositions in the *Memorex* litigation were taken under a stipulation that the depositions would be subject to a protective order and that the originals of all documents produced pursuant to subpoena would be returned to Forro. Within a week of the taking of the depositions, IBM returned the Merlin documents to Forro without restriction.

IBM became convinced that leaks of the Merlin drawings came from its San Jose laboratory. IBM initiated an investigation in 1972. In the course of this investigation, an informant told IBM that he had heard a rumor that Forro had technical information on the 3340, or "Winchester," Data Module. The first shipment of the Winchester device was not scheduled until November, 1973. IBM persuaded the informant to visit Forro and attempt to confirm the rumor. The informant contacted Forro but was unable to verify the rumor.

At trial, IBM introduced testimony of Fritz Damm, the former general manager of Damm and Zoon, a Dutch precision machine firm that produced Winchester parts for IBM. Damm testified that Fowler had contacted him several times in late 1972 and early 1973, attempting to acquire Winchester drawings and specifications from Damm. Fowler implied that Forro was already making certain Winchester parts. Although Damm testified at trial that he had delivered Winchester drawings to Fowler two weeks before the search of Forro, none of the drawings were uncovered in the search.

Forro began selling FP Winchester parts shortly after IBM's first shipment in November, 1973. Fowler testified that the specifications for Forro's FP Winchester parts were acquired through reverse engineering that took place immediately after the Winchester's first shipment date, and that he had not acquired any proprietary Winchester information through Damm. Fowler's testimony was belied by testimony of Forro's general sales manager, Knisely, that he had seen a copy of the Winchester specifications in Fowler's office almost a year before the alleged reverse engineering could have taken place. Fowler's testimony was also placed in question by the fact that one of Forro's parts exhibited characteristics peculiar to the European-made versions of the part. The European version of the Winchester parts were not shipped until after the date of the drawing that Fowler claimed was created by reverse engineering.

By March, 1973, IBM had arranged through an undercover agent to buy from a man named Steckel an entire set of illicit

Winchester drawings for $75,000. At that time, IBM had still not discovered the source within IBM. IBM decided to seek the aid of local Santa Clara County law enforcement officials in order "to find the path back into the lab, and also to produce a thunderclap" of adverse publicity for the firms implicated in the illicit trade.

In late March and early April, 1973, IBM officials met with representatives of the California Attorney General's office and Santa Clara County law enforcement officials to discuss what actions to take to discourage trade secret thievery. The San Jose Police Department, with the involvement and consent of the Santa Clara County District Attorney, agreed to take over the investigation. The investigation thenceforth became a cooperative effort between the police and IBM. An IBM undercover agent continued his work under police supervision. Funding for the investigation came from IBM in the form of cash payments totalling $24,300.

In June, 1973, warrants were issued for the search of eight locations, including the Forro facility. Probable cause to search Forro's place of business was predicated on the suspected presence of unlawfully acquired Merlin drawings. The police affidavits offered in support of the warrants were based in part on the 1971 *Memorex* depositions of Fowler and Knisely, and on IBM assertions that the documents produced by Forro had been IBM documents. IBM neglected to tell the police that IBM had returned the documents to Forro after the depositions.

Forro's Los Angeles plant was searched on June 29, 1973. The search lasted approximately twelve hours. Five IBM employees accompanied the police to aid in examining the seized material to see that it matched that described in the warrant. About four hundred drawings were seized, as well as price lists, correspondence, cost documents, and purchase orders. During the course of the search, Fowler and his son hid documents in a false ceiling and in a car, allegedly out of fear that a seizure of all documents would put Forro out of business.

The search of Forro's premises was widely publicized in industry trade journals. Forro incurred out-of-pocket expenses in the amount of $79,000 as a result of the search, and allegedly suffered further losses in sales and profits as a result of the adverse publicity. Although the investigations led to ten indictments, no indictment was sought against Forro or any of its employees or principals.

## II

## INTENTIONAL INTERFERENCE WITH CONTRACT

The jury found for Forro on its claim that IBM intentionally interfered with Forro's contractual relationships. Forro's theory is two-fold: first, that IBM orchestrated and participated in a police investigation of Forro in order to subject the company to a "thunderclap" of adverse publicity and thereby disrupt Forro's business relationships, and second, that IBM used deceitful means to persuade the police to cause the issuance of the search warrant for Forro's plant and then participated in the ensuing search and seizure of Forro's business records.

IBM, in challenging the verdict, raises several issues. It contends that:

1) Forro did not introduce sufficient evidence upon which the jury could base its assessment of damages;

2) The trial court abused its discretion in denying IBM's rule 37 motion to dismiss, which was based on alleged destruction of evidence by Forro; and

3) IBM's communications with law enforcement authorities and participation in the search of Forro's premises was privileged.

We hold that Forro introduced sufficient evidence on the damages question to support the jury's verdict and that the trial court did not abuse its discretion in denying the motion to dismiss. Accordingly, there need be no new trial on the damages issue. We find, however, that IBM's communications to the authorities and participation in

the search were privileged, and therefore we reverse.

### A. Sufficiency of Forro's Proof of Damages

Forro alleged that IBM's conduct caused it to incur out-of-pocket expenses of $79,000 and lost profits during 1974–1977, estimated on alternate theories to be $2,657,000 or $8,856,000. The jury agreed with Forro's lower estimate of lost profits and awarded $2,739,010 in compensatory damages. The lower of the two proffered figures was based principally on the opinion of Forro's president, Fowler. It was, in turn, based upon testimony adduced at trial from Forro customers, that Forro's business would have grown during the damages period by 30 per cent, and that Forro would have made 25 per cent profit on these incremental revenues.

IBM contends that Fowler's use of the 30 per cent growth factor was not justified by the testimony of Forro's customers nor by Forro's own internal growth projections and limits on its capacity to expand. IBM also attacked Fowler's assessment of the profit margin Forro would have realized from the incremental business.

We agree that proving damages is part of Forro's burden of showing a prima facie right to relief. We find that Forro introduced sufficient evidence to go to the jury.

■ California law requires that the fact of injury must be proved with certainty. However, once injury is established, California law allows the factfinder considerable latitude in ascertaining the *amount* of the award. The California courts recognize that ascertaining what profits would have been gained in the absence of tortious conduct is an inherently speculative endeavor.[2] *Drouet v. Moulton,* 245 Cal.App.2d 667, 54 Cal.Rptr. 278, 281–82 (1966); see also *Continental Car-Na-Var Corp. v. Moseley,* 24 Cal.2d 104, 113, 148 P.2d 9, 14 (1944).

■ IBM's arguments are directed principally to the certainty of amount, not the fact of injury. We find the jury could reasonably have inferred from the evidence presented that Forro lost business as a result of damage to its customer goodwill. Forro introduced evidence of the post-search publicity that implicated Forro in the traffic in stolen trade secrets, as well as testimony of some of its customers that the search was a factor in their decisions not to buy from Forro. This was sufficient evidence from which the jury could have inferred the existence of an injury. On the matter of the amount of damages, we find that the evidence was sufficient to support the jury's award.

### B. Dismissal for Destruction of Evidence

IBM moved under rule 37 of the Federal Rules of Civil Procedure to dismiss Forro's intentional interference claim because Forro allegedly destroyed blueprints that would have allowed IBM to trace the incorporation of its trade secrets into Forro's prod-

---

**2.** The California Court of Appeal explained this distinction as follows:

Generally speaking, there is no doubt that when the operation of a business is interrupted by wrongful acts, damages, whether of prospective profits or otherwise, should be ascertained with reasonable certainty from the past volume of business and other provable data, generally of a mathematical nature, relevant to what the profits were and what profit probabilities would have been or would be if the wrongful act had not been perpetrated.

It is also true, however, that "[t]his rule does not apply to uncertainty as to the *amount* of the profits which would have been derived, *but to uncertainty* or speculation as to *whether the loss of profits was the result* of the wrong and whether any such profits would have been derived at all."

. . . .

A wrongdoer should not escape liability for his wrong because damages cannot be measured with exactness.

Under the circumstances herein delineated, it is for the trier of fact to use the evidence available in assessing damages. "It is axiomatic that where substantial compensable injury is shown but the amount of the damage cannot be ascertained with reasonable certainty . . ., the question rests in the sound judgment and discretion of the trier of fact." *Drouet v. Moulton,* 245 Cal.App.2d 667, 54 Cal. Rptr. 278, 281–82 (1966) (emphasis supplied in part) (citations omitted).

ucts. The district court viewed the evidence as conflicting with regard to whether Forro had destroyed evidence, and denied the motion.

The decision to impose sanctions under rule 37 is in the trial court's discretion. *United States v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980). We do not think that IBM so clearly demonstrated its right to sanctions that we could say that the district court abused its discretion. We accordingly affirm the denial of the motion.

## C. Privilege for Communicating with and Assisting Authorities

IBM contends that its solicitation of police aid and its assistance in the search of Forro's premises are privileged under California law. The trial court ruled against IBM on these points and refused to give IBM's jury instructions on privilege. The judge instructed the jury,[3] however, that California's policy of encouraging citizens to report criminal activities to the authorities should be considered by it as a factor in determining whether IBM's conduct was justified.[4]

### 1. IBM's participation in the search

In deciding whether the trial court erred in refusing to instruct that IBM's participation in the search was privileged, we must apply California law. Our examination of the evidence adduced in this case and applicable California law leads us to conclude that the Supreme Court of California would hold that IBM's actions in assisting the police in making the search were privileged and could not serve as a basis for civil liability.[5]

The search of Forro's premises was conducted under authority of a validly issued search warrant. The police obtained the search warrant from a magistrate. The police requested IBM's aid in conducting

---

**3.** The trial court's instruction on IBM's justification defense was as follows:

*Instruction Number 43*

In addition to denying any wrongful or intentional interference with any prospective business advantage of the plaintiff, the defendant raises the defense that its conduct was justified under all of the circumstances shown by the evidence in the case.

The defendant has the burden of proof on this defense of justification. If you find from a preponderance of the evidence that the defendant was justified in the acts of which the plaintiff complains, then you should find for the defendant and against the plaintiff on the claim of intentional interference with plaintiff's prospective business advantage.

The defendant claims by way of justification that it was motivated by its desire to protect its trade secrets or proprietary information. Further, IBM claims justification based on the social duty of good citizens to aid in proper enforcement of the criminal laws.

I instruct you that a party has a right to take reasonable steps to protect its trade secrets and proprietary information from improper use by unauthorized persons.

I also instruct you that there is a strong public policy to encourage all citizens to assist law enforcement agencies by reporting criminal activities, and by cooperating with the duly authorized civil authorities in carrying out the law enforcement duties assigned to such authorities.

**4.** California recognizes justification as an affirmative defense to the torts of interference with a contractual relationship and interference with prospective advantage. The defense was explained by the California Supreme Court as follows:

Whether an intentional interference by a third party is justifiable depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances including the nature of the actor's conduct and the relationship between the parties.

*Herron v. State Farm Mut. Ins. Co.*, 56 Cal.2d 202, 206–07, 363 P.2d 310, 312, 14 Cal.Rptr. 294, 296 (1961). *See also Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d 13, 18, 144 Cal.Rptr. 664, 667–68 (1978); *A. F. Arnold & Co., v. Pac. Professional Ins., Inc.*, 27 Cal. App.3d 710, 713–16, 104 Cal.Rptr. 96, 98–100 (1972).

**5.** We have found no California case directly in point on the question of whether a private citizen may be subjected to civil liability when, at a peace officer's request, he aids the officer in conducting a search. Therefore, we must derive from a review of relevant California law the result the California Supreme Court would reach if presented with this case. *Scandinavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425, 427 (9th Cir. 1979).

the search because the search warrant required that technical documents be identified. A layman would not have had the expertise to identify the drawings containing IBM product specifications. Teams composed of police officers and IBM employees conducted the search. The IBM employees were accompanied by an officer at all times and acted under direct police supervision. The officer in charge of the search personally reviewed all materials to decide whether they should be seized. Forro does not argue that the actions of either the police or the IBM personnel in conducting the search exceeded the authority conferred by the warrant. Although Forro would have us view IBM as a puppeteer directing the actions of the police, our review of the record convinces us that the evidence provides no basis for inferring that the police were not in charge of obtaining the search warrant and the conduct of the search itself.

California allows officers to request the aid of citizens in executing search warrants. *People v. Turner*, 249 Cal.App.2d 909, 927, 57 Cal.Rptr. 854, 865, *cert. denied*, 389 U.S. 963, 88 S.Ct. 348, 19 L.Ed.2d 375 (1967); Cal.Penal Code § 1530 (West 1970). The California legislature has provided that a citizen aiding an officer has such powers as the supervising officer may delegate. Cal. Penal Code § 830.6(b) (West Supp. 1980). The officer himself is immune from suit arising out of the execution of a valid warrant. *Vallindras v. Massachusetts Bonding & Ins. Co.*, 42 Cal.2d 149, 265 P.2d 907, 910–11 (1954); Cal.Civ.Proc.Code § 262.1 (West 1954). The California legislature has not, however, expressly provided for such immunity for the citizen assisting a search.

■ We think that California Penal Code section 830.6(b) must be understood as according a citizen immunity that derives from the officer's own immunity. This result is supported by two California cases.

In *Peterson v. Robison*, 43 Cal.2d 690, 697, 277 P.2d 19, 24 (1954), the California Supreme Court held that a private citizen is not subject to an action for false imprisonment when he makes an arrest at a peace officer's request. The court reasoned that it would be unfair to impose civil liability on a person when a California statute made it a misdemeanor to refuse an officer's request to aid in an arrest.

A more recent California Supreme Court case, *Sokol v. Public Utilities Comm'n*, 65 Cal.2d 247, 418 P.2d 265, 53 Cal.Rptr. 673 (1966), held that a public utility was not civilly liable for disconnecting the plaintiff's phone after receiving notification from the local police chief that the phone was being used for illegal purposes. A state Public Utilities Commission regulation required the phone company to disconnect phone service whenever it had reasonable cause to believe that a subscriber was using the phone for an illegal purpose, and further provided that notice from a law enforcement officer of such usage was sufficient to constitute reasonable cause. The court noted by reference to *Peterson* that it would be unfair to impose liability on a person for doing what the law requires, and stated further that "[a] contrary rule would not only be inequitable but would discourage cooperation with law enforcement agencies." 65 Cal.2d at 258, 418 P.2d at 272, 53 Cal.Rptr. at 680.

We conclude that the California courts would extend the reasoning of *Peterson* and *Sokol* to provide immunity to IBM. An attempt to distinguish this case from *Peterson* and *Sokol* on the basis that no statute required IBM to assist the police in searching Forro's premises is unconvincing. The principal basis for the holdings in the California cases is the policy of encouraging citizens to aid the police. Police officers occasionally have need to seek help from private citizens in conducting valid searches. Indeed, such assistance may be more necessary to the police in the context of a search, where technical knowledge may be wanting, than in the arrest context addressed in *Peterson*. A citizen should not have to assess his potential civil liability when presented with a reasonable police request for assistance. Otherwise, citizen cooperation might be deterred.

## 2. IBM's Communications to Authorities

IBM contends that all of its communications to the authorities were absolutely privileged under section 47(2) of the California Civil Code (West Supp. 1980), which provides:

A privileged publication or broadcast is one made—

. . . .

2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . .

At trial Forro tried to show that IBM secured the cooperation of the San Jose Police through misrepresentation and fraud. Specifically, Forro asserted that IBM failed to inform the police that a protective order shielded the depositions on which the affidavit in support of the search warrant was based, failed to disclose that IBM's counsel had returned without restriction the Merlin drawings produced at the depositions, and misled the authorities into thinking the designs were trade secrets.

The privilege conferred by section 47(2) in defamation actions is absolute and unaffected by the presence of malice. *Albertson v. Raboff,* 46 Cal.2d 375, 295 P.2d 405 (1956); *Brody v. Montalbano,* 87 Cal. App.3d 725, 151 Cal.Rptr. 206 (1978), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979); *Pettitt v. Levy,* 28 Cal. App.3d 484, 104 Cal.Rptr. 650 (1972).[6] Underlying the privilege is the policy of encouraging freedom of communication between citizens and public authorities charged with investigating wrongdoing. *Brody v. Montalbano,* 87 Cal.App.3d 725, 151 Cal.Rptr. 206 (1978); *Imig v. Ferrar,* 70 Cal.App.3d 48, 138 Cal.Rptr. 540 (1977). Accordingly, the privilege applies to communications designed to prompt officials to initiate proceedings as well as to communications made during the course of proceed-

ings. *Brody v. Montalbano,* 87 Cal.App.3d 725, 151 Cal.Rptr. 206 (1978). Although by its terms the section 47(2) privilege applies only to defamation actions, California courts have invoked the policies underlying the privilege to defeat liability for interference with business relations and related torts. *Id.* at 738, 151 Cal.Rptr. at 215; *Scott v. McDonnell Douglas Corp.,* 37 Cal. App.3d 277, 292–93, 112 Cal.Rptr. 609, 619–20 (1974); *Bledsoe v. Watson,* 30 Cal.App.3d 105, 109–110, 106 Cal.Rptr. 197, 199–200 (1973).

Forro contends that the courts in *Brody, Scott,* and *Bledsoe* provided immunity under the rubric of the doctrine of justification, and only by analogy to the section 47(2) privilege. Forro asserts that the "justification defense" is not absolute and that it presents a question of fact to be decided on a case-by-case basis. It defends the instruction to the jury that it must balance the utility of the defendant's conduct against the hardship it causes and contends that there was evidence from which the jury could decide in Forro's favor.

It is true that the California courts have spoken in terms of "justification" rather than "privilege" when discussing why communications with officials may not serve as the basis of liability on a claim of intentional interference with a contractual relationship. However, the California court's use of the term "justification" appears to be synonymous with "privilege"—*i.e.,* certain kinds of conduct are justified as a matter of law, *H & M Assoc. v. City of El Centro,* 109 Cal.App.3d 399, 405–09, 167 Cal.Rptr. 392, 396–99 (1980); *Lowell v. Mother's Cake & Cookie Co.,* 79 Cal.App.3d 13, 17–22, 144 Cal.Rptr. 664, 667–70 (1978); *A. F. Arnold & Co. v. Pacific Professional Ins.,* 27 Cal. App.3d 710, 713–16, 104 Cal.Rptr. 96, 98–100 (1972). The *Brody, Scott,* and *Bledsoe* courts apparently considered communica-

---

**6.** In the intentional tort context, a privilege may be either "absolute" or "qualified." Conduct that is absolutely privileged may not be a predicate for liability regardless of the motive or purpose of the actor. A qualified privilege, however, in general only protects the actor where he can show that he acted reasonably and with proper motive. *See* W. Prosser, *Law of Torts* § 16 at 98–99 (4th ed. 1971).

tions with authorities to be justified under all circumstances.[7]

Forro asserts alternatively that although privilege may exist for properly motivated communications, privilege does not provide a shield if the challenged communications are not intended to achieve the objectives of the official proceeding. *See Bradley v. Hartford Accident & Indem. Co.*, 30 Cal. App.3d 818, 106 Cal.Rptr. 718 (1973).[8] *See also Royer v. Steinberg*, 90 Cal.App.3d 490, 153 Cal.Rptr. 499 (1979); *Frisk v. Merrihew*, 42 Cal.App.3d 319, 116 Cal.Rptr. 781 (1974). Forro argues that IBM cannot claim privilege because its objective was to harm Forro and others by creating a "thunderclap" of publicity, rather than to report wrongdoing.

Forro points to the jury's rejection of IBM's justification defense as an indication that IBM's motives were improper. The absolute privilege is not defeated, however, by the communicant's ulterior motives, *Scott v. McDonnell Douglas Corp.*, 37 Cal.App.3d 287, 112 Cal.Rptr. 609 (1974). There is ample support in the record for IBM's position that the company's communications to the authorities were made for law enforcement purposes as well as for the purpose of creating publicity.[9] Indeed the jury verdict for IBM on its claim for misappropriation of trade secrets could be read to indicate a view on the part of the jury that the communications to the authorities had in part a legitimate purpose. A California court would resolve any doubts in favor of a finding of privilege. *Twyford v. Twyford*, 63 Cal.App.3d 916, 134 Cal.Rptr. 145 (1976). We conclude that all of IBM's communications to the authorities were privileged.

Accordingly, we find that the trial court erred in failing to instruct the jury that IBM's communications with the authorities and its participation in the search were privileged under California law. The evidence relating to these activities was such a major part of the proof adduced by Forro in support of its claim of intentional interference that its admission at all and certainly its admission without proper instruction was prejudicial to IBM's cause.

Accordingly, we reverse and remand for a new trial on this count.

## III

## MISAPPROPRIATION OF TRADE SECRETS

The jury awarded $260,777 to IBM on its claim of misappropriation of trade secrets. Forro challenges both the sufficiency and the admissibility of the evidence supporting the claim.

### A. Sufficiency of the Evidence

The trial judge instructed the jury that IBM must prove

1) the drawings allegedly used by Forro constituted trade secret information and were so treated by IBM;

2) Forro improperly came into possession of the secret information;

3) Forro used the trade secret information in the conduct of its business; and

---

7. The courts in *Bledsoe* and *Scott* sustained demurrers to the complaint and the court in *Brody* upheld a directed verdict for defendant. The practical effect of this application of the justification defense is to accord immunity coextensive with and indistinguishable from the absolute privilege provided by section 47(2).

8. In *Bradley*, the plaintiff based a defamation claim on allegedly libelous statements contained in documents filed in a personal injury action. The trial court found the statements to be absolutely privileged under section 47(2) and dismissed the claim. The California Court of Appeal reversed, finding that the documents had been filed for the sole purpose of having the defamations republished by the news media. Because the publication was not made to achieve the objects of the litigation and promote the interests of justice, the court refused to afford the slanderer the protection of the statutory privilege. 30 Cal.App.3d at 826, 106 Cal.Rptr. at 723–24.

9. IBM explains that its expressed aim to create a "thunderclap" of publicity reflected the hope of some IBM security officials that the publicity attending criminal prosecutions would have a deterrent effect on trafficking in its trade secrets. Forro, on the other hand, says the desired effect was to discredit Forro in the eyes of its customers.

4) as a proximate result of this use Forro was unjustly enriched.

With regard to the first element of proof, Forro contends IBM's evidence was insufficient because it never specified beyond vague references to "dimensions and tolerances" exactly what trade secrets were misappropriated. Forro argues further that IBM was obligated to make direct comparisons between IBM and Forro drawings, and that such a juxtaposition would show that there had been no misappropriation. Forro also questions the sufficiency of the evidence to establish the second element, proof that Forro had improperly come into possession of the secrets.

 We find that IBM introduced sufficient evidence to allow the jury to identify the secrets claimed to be misappropriated. The definition of "trade secret" is broad:

It is now settled that a trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device or list of customers . . . .

*Sinclair v. Aquarius Electronics, Inc.*, 42 Cal.App.3d 216, 116 Cal.Rptr. 654, 658 (1974) (emphasis omitted). IBM introduced a wealth of evidence to the effect that Forro came into possession of compilations of information concerning the Merlin and Winchester devices in the form of engineering drawings and blueprints. We do not think that IBM's burden of proof required a direct comparison of Forro's drawings with IBM's. We think the evidence was sufficient to permit the inference that Forro improperly acquired what it knew to be IBM's proprietary information. There was ample testimony about the acquisition of Merlin drawings through Shinn of Sigma Technology. The fact that Forro offered Merlin parts before the date of IBM's first shipment to customers suggests that the specifications used by Forro were IBM's work product rather than information acquired through reverse engineering. Damm testified that Fowler solicited and acquired Winchester information. The similarity of one of Forro's Winchester-compatible parts to the European-made version of the part corroborated IBM's assertion that the specifications were acquired through Damm, as opposed to Forro's assertion that it reverse engineered the part from a United States-made part it had lawfully acquired. If Forro copied the European version of the part, it used confidential information, because its drawing was dated prior to the time it could have first acquired the European part legally. Furthermore, although the drawings hidden by Fowler and his son on the day of the search were never identified at trial, the jury could have inferred from the activity that Fowler and his son were concealing secret IBM information.

## B. Admissibility of Certain Evidence

We likewise reject Forro's contentions that the trial court improperly admitted certain evidence. The trial court admitted hearsay evidence relating to IBM's trade secrets investigation and the ensuing arrests, indictments, and convictions, for the limited purpose of showing IBM's state of mind when it requested help from the San Jose Police. Forro contends that the probative value of the evidence was substantially outweighed by its prejudicial effect and that the jury inferred from the evidence that Forro must have been implicated in the theft of trade secrets. Fed.R.Evid. 403.

 The trial court's ruling in this regard was within its discretion, 22 C. Wright & K. Graham, *Federal Practice and Procedure*, § 5212 at 250–58 (1978), and we cannot say that it abused its discretion. The evidence was central to IBM's defense to the intentional interference and antitrust claims. In view of the limiting instruction given by the judge that the evidence be used only to show IBM's state of mind, we cannot say that its prejudicial effect "substantially outweighed" its probative value.

Forro's remaining assertions of error relate to matters peculiarly within the trial court's discretion. We find them without merit. Forro claims that the trial judge erred in allowing IBM witnesses Anderson and Finck to testify even though they were not identified until after the trial commenced; in determining that circumstances did not warrant an instruction that an adverse inference could be drawn from the production of weak evidence when strong evidence was available; and in refusing to admit into evidence marginally relevant exhibits concerning correspondence between IBM and another vendor. We disagree.

We accordingly affirm the judgment in favor of IBM on its claim of misappropriation of trade secrets.

### IV

### SHERMAN ACT SECTION 2 CLAIMS

After the jury had deadlocked on Forro's antitrust claims, IBM moved for entry of judgment under Fed.R.Civ.P. 50(b), which provides that "[i]f no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial." The trial court in deciding whether to grant the motion should view conflicting evidence in the light most favorable to the non-movant, and determine whether the proffered result is the only reasonable conclusion. 5A *Moore's Federal Practice* ¶ 50.07[2] (2d ed. 1980). Our review is controlled by the same standard. In making our review, we must accept as true facts that necessarily were established by the jury's verdicts in favor of Forro on the intentional interference claim and in favor of IBM on the misappropriation claim.

We address first IBM's arguments that there was a failure of proof on essential elements of the monopolization and attempted monopolization claims. We conclude that IBM was entitled to judgment on the monopolization claim because Forro failed to introduce sufficient evidence to establish IBM's market power. We further agree with the district court that the evidence was insufficient to present an issue for the jury on the attempted monopolization claim. Finally, we hold that IBM's invocation of police assistance, which resulted in an investigation and a search of Forro's plant, may not serve as the basis of an antitrust claim because these actions are accorded immunity.

#### A. Section 2 Monopolization Claim

Generally speaking, a plaintiff claiming a violation of the Sherman Act's proscription of monopolization must establish three things:

(1) possession of monopoly power in the relevant market;

(2) willful acquisition or maintenance of that power; and

(3) causal "antitrust" injury.

*California Computer Prods. v. International Business Machines Corp.*, 613 F.2d 727, 735 (9th Cir. 1979). IBM contends that Forro did not introduce evidence sufficient to support a finding that IBM possessed monopoly power. IBM points out that Forro's proof on this element consisted solely of two items of evidence:

(1) a stipulation that IBM's share of the domestic electronic data processing market was 30–35% and that its share was declining in the early 1970's; and

(2) a partial listing of United States-based electronic data processing firms and their revenues.

IBM further notes that Forro produced no expert testimony to interpret either piece of evidence.

IBM asserts that a 35% market share is inadequate as a matter of law to support an inference of monopoly power. We find that Forro has not introduced sufficient evidence to allow a jury to infer that IBM possessed market power. In the absence of further information about the market, a 35% market share, and particularly a declining 35% market share, provides little or no support to a claim of market power. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924–25 (9th Cir. 1980), *cert. denied*, 450 U.S. 921, 101 S.Ct.

1369, 67 L.Ed.2d 348 (1981). Forro would have us infer from the list of competitors that market power existed because IBM, despite its low market share, was large in relation to each of its individual competitors. Without the benefit of expert testimony or other credible evidence to support an inference of market power from the list of companies and the market share, any such inference would be sheer speculation. We find that a reasonable person could not have justifiably inferred the existence of monopoly power from the evidence Forro submitted.

## B. Section 2 Attempted Monopolization Claim

The trial court granted judgment against Forro not only on the monopolization claim but on its attempt-to-monopolize claim.

 Specific intent and anticompetitive conduct are essential elements of a claim of attempted monopolization. *See, e.g., Greyhound Computer Corp. v. International Business Machines Corp.*, 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied*, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 669 (9th Cir. 1980). Specific intent may, of course, be proved by direct evidence but is more usually proved by inference from anticompetitive conduct. *California Computer Prods. v. International Business Machines Corp.*, 613 F.2d 727, 736–37 (9th Cir. 1979).

 This circuit has rejected the premise that probability of actual monopolization is an essential element of proof of attempt to monopolize. Specific intent to monopolize is sufficient and that intent may be inferred from conduct. *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, 474 (9th Cir. 1964). But, where as here there is not proof of market power, the conduct to support an inference of specific intent to monopolize, should be of a kind clearly threatening to competition or clearly exclusion-

ary. *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 854 n.4 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

Forro's proof of intent was based wholly on inference from IBM's conduct and its effects. To support the inference of anticompetitive intent, Forro relied heavily on IBM's conduct in approaching the San Jose Police Department and participating in the search of Forro. IBM argues that it is immune from antitrust liability for this conduct under the *Noerr-Pennington* doctrine. *See United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

 The *Noerr-Pennington* doctrine immunizes from the antitrust laws anticompetitive conduct undertaken to influence or petition government bodies, or to utilize judicial or quasi-judicial mechanisms. The grant of immunity promotes two policies: (1) protection of the political process, because decision-making bodies rely on private parties to come forth with information; and (2) protection of the individual's right to petition government. *Noerr*, 365 U.S. at 137–38, 81 S.Ct. at 529–30. *See generally, Subscription Television, Inc. v. Southern California Theatre Owners Ass'n*, 576 F.2d 230 (9th Cir. 1978). This doctrine was applied in *Noerr* to a publicity campaign aimed at passage and enforcement of state laws, and in *Pennington* to efforts to secure favorable action from executive-branch officials. Immunity has since been granted to "the approach of citizens . . . to administrative agencies . . . and to courts." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972). *See also Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers*, 542 F.2d 1076 (9th Cir. 1976).[10] The one case we have discovered

---

**10.** Other courts have reasoned that the scope of immunity depends on the degree of political discretion exercised by the government agency. *Hecht v. Pro-Football, Inc.*, 444 F.2d 931, 941–

42 (D.C.Cir.1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972); *Woods Exploration & Producing Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1296–98 (5th Cir.

that specifically found the doctrine applicable to a citizen's approach to a law enforcement agency is *Harman v. Valley National Bank of Arizona*, 339 F.2d 564 (9th Cir. 1964), wherein the attorney general of Arizona was induced to file an action that resulted in placing the Arizona Savings and Loan Association in receivership and closing its business. The court's rationale was that the citizen's conduct in informing the attorney general of alleged "irregularities" and persuading him to take enforcement action was essentially political in nature. *Id.* at 566. We do not liken an approach to the police for aid in apprehending wrongdoers to political activity. However, we think that the public policies served by ensuring the free flow of information to the police, although somewhat different from those served by *Noerr-Pennington*, are equally strong. Encouraging citizen communication with police does not generally promote the free exchange of ideas, nor does it provide citizens with the opportunity to influence policy decisions. *Compare Noerr*, 365 U.S. at 137–38, 81 S.Ct. at 529–30. Nonetheless, it would be difficult indeed for law enforcement authorities to discharge their duties if citizens were in any way discouraged from providing information. We therefore hold that the *Noerr-Pennington* doctrine applies to citizen communications with police.

Forro argues that, even if communications with police are generally immunized, IBM's conduct falls within the "sham exception" first articulated in *Noerr*. The Court in that case suggested that anti-competitive conduct "ostensibly directed toward influencing governmental action, [which] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," is not immune. 365 U.S. at 144, 81 S.Ct. at 533. In *Noerr*, the Court

held that even deliberately deceptive advertising aimed at influencing legislative decisions was immune from the antitrust laws. However, the Court applied the exception in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and allowed an antitrust claim to be based on repetitive filing of baseless petitions before a state agency. The Court found that conduct to be an attempt to clog the agency's decision-making process and to deprive the competitor of an opportunity to have its applications considered. *See also Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (sham exception applicable to filing of baseless lawsuits for anti-competitive purposes).

The sham exception permits the imposition of antitrust liability on those seeking action from government agencies only when the activity in question can serve no useful purpose, and is undertaken for purely anti-competitive reasons. If, in the case before us, IBM had provided the police with deliberately false information, solely for the purpose of harassing Forro or of achieving other ends unrelated to law enforcement, its conduct would unquestionably come within the sham exception.

However, even when the evidence is viewed most favorably toward Forro, we cannot say that the evidence would support a finding that IBM's request for help from the San Jose Police Department in catching those who were stealing its trade secrets was a sham. The evidence may support an inference that IBM had the intent to harass the PCM's and their vendors, but Forro had to show as well that IBM had no legitimate purpose in going to the police or that it used the police in an illegitimate manner. The jury's verdict for IBM on its claim of

1971), *cert. denied*, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). We agree that claimed abuses of government processes should receive more intense scrutiny outside the area of legislative activity. *See also Rodgers v. FTC*, 492 F.2d 228, 232 n.3 (9th Cir. 1974) (dictum); *Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272, 275–80 (D.C.Cir.1972); *Semke v. Enid Automo-*

*bile Dealers Ass'n*, 456 F.2d 1361, 1366–67 (10th Cir. 1972); *Outboard Marine Corp. v. Pezetel*, 474 F.Supp. 168, 176–78 (D.Del.1979); *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F.Supp. 1019, 1023–24 (S.D.Tex.1972); 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 204 (1978).

misappropriation of its trade secrets indicates that IBM had cause to seek help from the police,[11] and our review of the record supports that finding. All that can be inferred from the jury's verdict in favor of Forro on its claim of intentional interference is that IBM intentionally interfered with Forro's relationship with its customers.[12] This would be consistent with a finding of anticompetitive intent, but it sheds no light on whether IBM had a valid purpose in seeking police assistance.

The facts the jury necessarily found in rejecting IBM's justification defense to the interference claim must be viewed in context. The court instructed the jury to balance the harm caused to Forro by the interference with its ongoing business relationships with its customers against the·conduct of IBM in protecting its trade secrets and aiding the police in law enforcement.[13] The most that can be said is that the jury found that on balance, IBM's interference with Forro was excessive under the circumstances.[14] The *Noerr-Pennington* doctrine requires a very different analysis. If IBM in good faith asked the police to perform a valid police function, IBM's conduct is immune from antitrust liability notwithstanding the fact that IBM also had anticompetitive intent. We are unwilling to infer from the jury's rejection of the justification defense that it found IBM's solicitation of police assistance to be a sham.

We conclude that Forro's antitrust claim may not be based on IBM's solicitation of aid from the San Jose Police Department that resulted in the police investigation and search of Forro's premises, or on IBM's assistance in these activities.

 Forro's other evidence is insufficient to support the attempted monopolization claim. Forro showed at most that IBM's actions harmed Forro, a vendor with

**11.** The trial court's general instruction on the misappropriation claim was as follows:

*Instruction Number 44*

The defendant makes a counterclaim for damages against the plaintiff, claiming that the plaintiff misappropriated trade secret information that belonged to the defendant.

To prevail on such a claim against the plaintiff, the defendant must establish, by a preponderance of the evidence in the case, each of the following essential elements:

FIRST: That the information involved constituted trade secret information, and was so treated by the defendant;

SECOND: That the plaintiff improperly came into possession of defendant's trade secret information;

THIRD: That plaintiff used the trade secret information in the conduct of its business; and

FOURTH: That as a proximate result of plaintiff's use of defendant's trade secret information, plaintiff was unjustly enriched.

**12.** The trial court's instructions on the intentional interference claim are in relevant part as follows:

*Instruction Number 37*

Plaintiff also makes a claim that the defendant IBM intentionally interfered with the plaintiff's prospective business advantages.

To prevail on this claim, the plaintiff must prove, by a preponderance of the evidence in the case, each of the following essential elements:

FIRST: That an economic relationship existed between the plaintiff and its customers,

containing the probability of future economic benefit to the plaintiff;

SECOND: That the defendant knew of the existence of the relationship;

THIRD: That there were intentional acts on the part of the defendant designed to disrupt the relationship;

FOURTH: That there was an actual disruption of the relationship; and

FIFTH: That the defendant's acts proximately resulted in damage to the plaintiff's business.

\* \* \* \* ·\* \*

*Instruction Number 40*

The third element of a claim of intentional interference with prospective business advantage is that the defendant had the specific· intent to disrupt the economic relationship. That is, you must find that, with knowledge of the plaintiff's economic relationships, the defendant took specific action which was taken for the purpose of harming those relationships.

It is not sufficient, in order to establish specific intent, for you to find that the defendant had .knowledge of the relationship, and that the defendant took an act which had some effect upon that relationship. Instead, you must find that the act or action was so taken with the intent of adversely affecting the plaintiff's economic relationship.

**13.** *See* note 3, *supra.*

**14.** *See* note 4, *supra.*

whom IBM does not directly compete. There was no demonstrated effect on competition generally, at either of two levels, *i.e.*, among PCM's or among vendors to the PCM's. IBM argues that Forro was just one among many suppliers to PCM's and that entry barriers for the PCM vendor industry were low. It asserts that its conduct aimed at halting industrial theft had none of the usual components of the type of economic restraints that could give rise to inferences of specific anticompetitive intent. Under these circumstances, IBM argues the inference of specific intent to monopolize the worldwide market for electronic data-processing products and services (the market to which the parties stipulated) is simply implausible. The district court dismissed the attempt claim on the basis that Forro failed to present substantial evidence to make out a *prima facie* case of attempted monopolization. We agree.

We conclude that the trial court properly granted judgment to IBM on Forro's monopolization and attempted monopolization claims.

The case is AFFIRMED in part, REVERSED in part, and REMANDED for proceedings consistent with this opinion.